MUCKLESHOOT INDIAN TRIBE and
Suquamish Indian Tribe, Plaintiffs,

v.

Colonel Philip L. HALL, District Engineer for the Seattle District of the United States Army Corps of Engineers; John O. Marsh, Secretary of the Army; United States Department of the Army, Corps of Engineers; City of Seattle, a municipality of the State of Washington; Elliott Bay Marina Group, a partnership; and David M. Abercrombie, Defendants.

No. C88–384Z.

United States District Court,
W.D. Washington,
at Seattle.

July 5, 1988.

On Determination of Bond and For
Temporary Restraining Order
July 11, 1988.

On Motion for Reconsideration
Sept. 6, 1988.

Robert L. Otsea, Jr., Laura Ann Lavi, Office of the Tribal Atty., Muckleshoot Indian Tribe, Auburn, Wash., Phillip E. Katzen, Alexandra Harmon, Evergreen Legal Services, Native American Project, Seattle, Wash., for plaintiffs.

Susan Barnes, Asst. U.S. Atty., Seattle, Wash., for Colonel Philip L. Hall, John O. Marsh, U.S. Dept. of the Army Corps of Engineers.

G. Richard Hill, John McCullough, Foster, Pepper & Shefelman, Seattle, Wash., for Elliott Bay Marina Group.

Judith B. Barbour, Seattle City Atty., Seattle, Wash., for City of Seattle.

Mair, Abercrombie, Camiel & Rummonds, Seattle, Wash., for David M. Abercrombie.

Mason D. Morisset, Terence L. Thatcher, Pirtle, Morisset, Schlosser & Ayer, Seattle, Wash., for Tulalip Tribes of Washington, amicus curiae.

Richard S. White, Helsell Fetterman Martin Todd, Seattle, Wash., for Homeowners, intervenors.

## ORDER GRANTING PRELIMINARY INJUNCTION

ZILLY, District Judge.

THIS MATTER comes before the Court on the motion of plaintiffs Muckleshoot Indian Tribe and Suquamish Indian Tribe ("the Tribes") for a preliminary injunction enjoining the construction of a 1200–slip marina, the Elliott Bay Small Craft Harbor (the "Marina"), pending trial of the merits in this case. The Tribes contend that a preliminary injunction is necessary because construction of the Marina would eliminate a portion of one of their usual and accustomed fishing areas in Elliott Bay and thus

would interfere with their treaty right to fish at the Marina site.

The Tribes seek an order specifically (1) restraining the defendant partnership Elliott Bay Marina Group ("Marina Group") from building the Marina and from dredging any material or placing any material into Elliott Bay; and (2) requiring defendants the United States Department of the Army Corps of Engineers, Col. Philip L. Hall (District Engineer for the Seattle District of the United States Army Corps of Engineers), John O. Marsh (Secretary of the Army) (collectively referred to herein as "the Corps" or "the federal defendants"), and the City of Seattle ("the City") to suspend any permit or other permission that would allow the Marina Group to proceed with construction or operation of the Marina, and enjoining these defendants from taking any action to permit or allow any further construction.[1]

Having reviewed the motion, together with all documents and materials filed in support and in opposition, having heard oral argument and being fully advised, the Court has concluded that a preliminary injunction should issue. The Court entered an order granting a preliminary injunction on June 30, 1988. This order provides the parties with the reasons for the Court's decision. *See* Fed.R.Civ.P. 65(d).

## I. FACTS

A. *The Marina Project and the Claimed Impact of the Loss to the Tribes' Usual and Accustomed Fishing Area*

The defendant Marina Group proposes to construct a 1200–slip boat moorage basin at the base of Magnolia Bluff in Seattle, occupying approximately 78 acres on the north side of Elliott Bay in Puget Sound. Final Environmental Impact Statement ("EIS"), at 28. The project site is about 1000 feet west of the existing Pier 91 and fronts about 2800 feet of shoreline. Final EIS, at iii; Record of Decision ("ROD"), at 3.

Elliott Bay is located within two harvest management catch reporting areas designated by the Washington State Department of Fisheries—Areas 10 (Outer Elliott Bay) and 10A (Inner Elliott Bay). ROD, at 43; Final EIS, at 140; Technical Appendix O, at 0–4. The present boundary between the two areas is a straight line from Pier 91 to Duwamish Head. The proposed Marina site is next to the eastern boundary of Area 10 (Outer Elliott Bay), between Four Mile Rock and Pier 91. ROD, at 38; Final EIS, at 212.

The Muckleshoot and Suquamish Tribes identify the area between Four Mile Rock and Pier 91 as a prime chinook fishing area. The Tribes indicate that they fish for chinook in the kelp beds, as close to the shoreline as possible. Final EIS, at 212. The Tribes also identify the area from West Point to Pier 91 as a productive fishing site. Final EIS, at 212.

The Tribes claim that Area 10 is a usual and accustomed fishing place, reserved for their access and use under the Treaty of Point Elliott, 12 Stat. 927 (1855), and that construction of the Marina, by occupying a portion of Area 10 and eliminating a part of their usual and accustomed fishing places, would irrevocably deny them their federally-protected right of access to this area. The Muckleshoot Tribe indicates that it first notified the developer of its opposition to the Marina in 1983. Administrative Record, at E–371.

The Corps, in its Record of Decision ("ROD"), states that the Marina would eliminate about 130 acres of the area between West Point and Pier 91, about 70 acres of which the Tribes presently use for net retrieval of fish. Final EIS, at 212. According to the Corps, the area to be eliminated represents about 6% of the chinook fishing area from West Point to Pier 91, and about 27% of the prime chinook fishing area between Four Mile Rock and Pier 91. ROD, at 38; Final EIS, at 212, Figure 35. In contrast, the Tribes estimate

---

1. On April 27, 1988, the Court granted leave to Tulalip Tribes to appear as amicus curiae. Tulalip Tribes filed a memorandum in support of

the motion for preliminary injunction and appeared at oral argument.

a loss of over 40% of the fishing area between Four Mile Rock and Pier 91. ROD, Appendix A (Comments on the Final EIS and the District Engineer's Responses), at 10–13; Hatch Declaration, para. 36; see also Technical Appendix O, at O–22 to O–30.

The Final EIS states that the Tribes' salmon fishing is limited to a few areas within the combined usual and accustomed fishing places, for numerous reasons, including fishing conditions and interference from traffic in Puget Sound. Final EIS, at 136. The Corps identifies seven major areas of concentrated commercial fishing activity by the Tribes in central Puget Sound, including the area from West Point to Pier 91. Final EIS, at 136; see also Amended Record of Decision ("AROD"), at 50–51. Three of these Puget Sound fishing areas are in Elliott Bay: the area offshore Magnolia Bluff between Pier 91 and Four Mile Rock, where the Marina is to be built; the mouth of the Duwamish; and the area between Duwamish Head and Alki Point. However, the Tribes contend that difficulties with the latter two areas make the first area more important to their fishing. See AROD, at 27; Hatch Declaration, paras. 32–33. The Tribes contend that the area between Pier 91 and Four Mile Rock is "by far the most productive" of the three areas, that fishing in this area is important to their livelihood, subsistence, and culture, and that there are few places other than Elliott Bay where they can now fish for chinook salmon because of conservation and allocation concerns. Hatch Declaration, para. 25. The Corps recognizes that "available fishing places have shrunk through development of Seattle's shoreline. Due to this, the Four Mile Rock to Pier 91 area may well have importance now that it

did not have at treaty times." AROD, at 49.

The Corps estimates that the proposed development will cause the Tribes financial loss in the amount of $9,335 in lost annual harvest and a $3,745 minimum average annual increase in gear loss (as a result of increased boat traffic). Final EIS, at 214–16. Another estimate by the Corps provides a range of loss from $25,000 to $40,-000. Administrative Record, at H–110. The Tribes calculate the possible loss to Indian fishers as a result of the development to be over $255,000 annually (based on a partial accounting of impacts). Meyer Declaration, para. 4.

### B. History of the Permit Process

The Marina Group began applying for permits from the City of Seattle and the United States Army Corps of Engineers [2] in 1983. The entire process has been extensive in time and in efforts to involve all interested parties. See, e.g., Final EIS, at 269; Appendix Q, Public and Agency Review.

On May 19, 1983, the Marina Group applied to the Corps for a permit under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and Section 404 of the Clean Water Act of 1977, 33 U.S.C. § 1344, to develop a small craft harbor and marina for approximately 1200 boats. ROD, at 3. The primary purpose and benefit of the Marina would be to meet a documented need for moorage space in King County, a need which is expected to increase during the next decade. Final EIS, at 6, 23 et seq. On June 6, 1983, the Seattle District of the Army Corps of Engineers issued an initial Public Notice of Application for Permit. Final EIS, at 269; ROD, at 3–4.[3]

---

**2.** The United States Army Corps of Engineers has regulatory authority over all construction activities in navigable waters of the United States. Final Environmental Impact Statement, at iii.

**3.** The permit process before the City paralleled the Corps proceedings and its history is summarized here. On November 23, 1983, the Marina Group applied to the City for a Shoreline Substantial Development Permit and Variance, re-

quired by the Seattle Shoreline Master Program under the Shoreline Management Act of 1971, RCW 90.58. Technical Appendix P. In September 1985, following preparation of a draft EIS under the Washington State Environmental Policy Act ("SEPA") and public review and comment, the City published its SEPA Final EIS. The City issued its Analysis and Decision granting approval of the marina project on certain conditions on March 26, 1986. The decision was appealed to the State Shoreline Hearings

After holding meetings and receiving public and agency comments, on June 1, 1984, the Corps issued a revised public notice reflecting a modified proposal. The Draft Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA") was published in October 1984.

In light of comments received on the revised proposal from the concerned public, the Tribes, and environmental reviewing agencies, the project was again modified and a new public notice issued on August 15, 1986. ROD, at 4. The NEPA Final EIS was published in January 1987. On July 24, 1987, the Corps issued the Record of Decision and permit for the proposed Marina. By this time, the Corps had held additional meetings and discussions and reviewed a substantial amount of documentation and comments. The ROD explains the District Engineer's reasoning, summarizes public comment and his responses, and sets forth his conclusions.

The permit included special permit conditions ("SPCs") to mitigate some impacts of the Marina on the Tribes' treaty fishing rights. ROD, at 38–40; AROD, at 1–4 (text of SPCs). Some of the conditions allowed the Tribes to fish under specific circumstances within the Marina. For example, SPC "a" required the Marina Group to provide at least two set net locations within the Marina for the Tribes and SPC "d" allowed the Tribes to attach nets to the outside of the breakwater. ROD, at 38–39. The District Engineer determined that the positive aspects of the project far outweighed the negative aspects and that, considering the mitigation measures in the ROD, there would be no abrogation of Indian treaty fishing rights. ROD, at 50.

On July 28, 1987, the Muckleshoot Tribe filed a lawsuit, *Muckleshoot v. Hall*, No. C87–1013C, concerning issuance of the permit, and on August 20, 1987, the Tribe filed a motion for preliminary injunction. The Suquamish Tribe intervened in that lawsuit. On August 31, 1987, the federal defendants suspended the Marina permit to

Board. After the permit was revised, on November 14, 1986, the City issued a Shoreline

allow further public comment on the mitigation measures required by the SPCs that were not previously available for public comment, and for discussion concerning the "related controversy" and lawsuit. AROD, at 1.

On September 4, 1987 the Corps issued a public notice to allow comment on the permit conditions. AROD, at 1. The Tribes and the Department of the Interior objected to the special conditions for specific reasons well documented in the record. The Department of the Interior, Fish and Wildlife Service, stated, "meaningful mitigation to offset the significant loss of usual and accustomed fishing area can not be achieved." AROD, at 7; *see also* AROD, at 7–10, 16, 18.

After careful consideration and discussion of the material before the Corps, the District Engineer concluded:

the area to be occupied by the marina is only a fraction of a percentage of the Tribes' adjudicated usual and accustomed fishing places. Also, my determination is that the proposed marina will not substantially impair the Tribes' right of access; nor will it impair the Tribes' ability to meet their moderate living needs.

AROD, at 51.

On March 16, 1988, the Corps reinstated the permit, deleting several of the special conditions and modifying others. *See* AROD, at 36 (explaining Corps' reasons for changes and deletions).

On March 25, 1988, the Muckleshoot and Suquamish Tribes filed this lawsuit. The Tribes then brought this motion for preliminary injunction.

## C. *Opposition of Federal Agencies*

In addition to the Tribes' objection, the ROD and AROD reflect serious opposition by the United States Department of the Interior (the Bureau of Indian Affairs and the Fish and Wildlife Service) and the United States Department of Commerce (the National Marine Fisheries Service).

Substantial Development Permit and Variance, over the Tribes' objection.

Following the publication of the Final EIS, on January 23, 1987, the Bureau of Indian Affairs noted its "substantial concerns about the treatment of Indian treaty fishing rights in the FEIS" and stated: "By authorizing a loss of a portion of a usual and accustomed fishing area, the Corps would be destroying treaty fishing rights at that particular portion of the fishing area." Hickey Declaration, Ex. 15. The Department of the Interior, Office of Environmental Project Review, in forwarding this letter to the District Engineer, pointed out "the serious jurisdictional issue of treaty fishing rights, which are protected by this Department for the Tribes." Hickey Declaration, Ex. 15.

The Department of the Interior, Fish and Wildlife Service, submitted objections on September 15, 1986, and recommended that the permit be withheld:

> DOI has the opinion that the Tribes would essentially be denied access to one of their usual and accustomed fishing places.... In their opinion, the Corps has no congressional authority to diminish this treaty right ... DOI stated that no amount of mitigation or compensation would be satisfactory to the Tribes for lost fishing opportunities.

ROD, at 8; see also Hickey Declaration, Ex. 14 (Department of Interior letter of April 8, 1987, emphasizing that "[t]he recognition and protection of Indian Treaty Rights is the vested responsibility of the Federal Government"); Hickey Declaration, Ex. 11 (Department of Interior letter of July 20, 1987); AROD, at 6–7.

The National Marine Fisheries Service has responsibilities pertaining to the protection of marine, estuarine, and anadromous commercial and recreational living resources and the habitat sustaining these resources. Declaration of Hickey, Ex. 10 (letter of National Marine Fisheries Service). In a letter to the District Engineer dated July 22, 1987, this agency stated:

> The Corps conclusion that there will be no loss of tribal fishing treaty rights resulting from marina construction and operation (page 50) is unfounded. The DROD concedes that the Muckleshoot

and Suquamish tribes fish in the vicinity of the proposed marina facility ... Furthermore, the 404(b)(1) evaluation completed by the Corps ... states that the proposed marina would reduce one of two identified "prime" tribal fishing areas between Fourmile Rock and Pier 91 by approximately 27 percent.

Hickey Declaration, Ex. 10, at 2. In a letter dated October 5, 1987, the National Marine Fisheries Service repeated its objection to the "elimination" of the tribal fishing area and recommended denial of the permit.

The National Marine Fisheries Service, Fish and Wildlife Service, and Bureau of Indian Affairs, due to their significant expertise in their respective fields of Indian affairs, fish or marine resources, are well able to evaluate the potential loss to the Tribes. The Court finds the views of these federal agencies persuasive.

### D. *Interest of Homeowners*

Also interested in the development of the Marina are homeowners whose property is on or near the edge of Magnolia Bluff. The area has had numerous major landslides that have left several homes at the crest of the bluff at risk and have repeatedly caused breaks in a trunk sewer line located at the base of the bluff. Final EIS, at 44. The Marina construction includes the placement of 500,000 cubic yards of fill at the toe of the bluff, which would stabilize the area. The homeowners filed a motion to intervene in the present lawsuit, emphasizing the urgency of their claims. After the hearing on this motion for a preliminary injunction, and after considering all materials submitted in favor of and in opposition to the motion to intervene, the Court granted the homeowners' motion to intervene. The Court has considered the homeowners' memorandum opposing the preliminary injunction.

### II. STANDARD FOR PRELIMINARY INJUNCTION

The basic function of a preliminary injunction is to preserve the status quo pending a determination of the action on the

merits. *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1200 (9th Cir.1980). To obtain a preliminary injunction,

> the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in its favor. These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.

*United States v. Odessa Union Warehouse Co-op.*, 833 F.2d 172, 174 (9th Cir. 1987) (citations omitted). The decision to grant or deny a preliminary injunction lies within the discretion of the trial court, and its order will be reversed only if the court relied on an erroneous legal premise or otherwise abused its discretion. *Chalk v. United States Dist. Court*, 840 F.2d 701, 704 (9th Cir.1988); *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 936 (9th Cir.1987). In certain cases, the moving party must show that the public interest will be advanced by the preliminary injunction. *Odessa Union*, 833 F.2d at 174; *see Chalk*, 840 F.2d at 711.

The Tribes claim that they will be successful at trial on two theories: (1) construction of the Marina will deny the Tribes their treaty right of access to a usual and accustomed fishing area; and (2) the EIS prepared by the federal defendants is inadequate because it fails to discuss, analyze and evaluate (a) mitigation measures and (b) the cumulative impacts of the Marina proposal.

### III. TREATY FISHING RIGHTS

#### A. Probable Success on the Merits

##### 1. The Marina Site is Within The Tribes' Usual and Accustomed Fishing Grounds.

The treaty fishing right of the plaintiff Tribes is established in article V of the Treaty of Point Elliott, 12 Stat. 927 (1855), which provides:

> "The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory...."

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 661–62, 674 & n. 21, 99 S.Ct. 3055, 3062–63, 3068 & n. 21, 61 L.Ed.2d 823, 830, 838–39 & n. 21, *modified on other grounds*, 444 U.S. 816, 100 S.Ct. 34, 62 L.Ed.2d 24 (1979) [hereinafter *Fishing Vessel* ].[4]

The defendants contend that the Tribes have not shown they have a treaty right to take fish from the Marina site. However, throughout the administrative record, the Corps refers to the Marina site as a tribal usual and accustomed fishing ground or area. The Final EIS concludes:

> The proposed Elliott Bay Marina would eliminate a portion of one of the two identified Indian commercial fishing areas within Area 10 and within the Muckleshoot and Suquamish Tribes' usual and accustomed fishing area.

Final EIS, at 212.[5]

The District Engineer acknowledges that

**4.** The Muckleshoot Tribe is the successor to tribes or bands which were parties to the Treaty of Point Elliott and the Treaty of Medicine Creek. *United States v. Washington*, 384 F.Supp. 312, 365 (W.D.Wash.1974) [hereinafter *Boldt I* ], *aff'd*, 520 F.2d 676 (9th Cir.1975), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), *substantially aff'd sub nom. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). The provision regarding fishing rights is the same in both treaties. *Boldt I*, 384 F.Supp. at 331. The Suquamish Indian Tribe was a party to the Treaty of Point Elliott. *United States v. Washington*, 459 F.Supp. 1020, 1040 (W.D.Wash.1978), *appeal*

*dismissed*, 573 F.2d 1117 (9th Cir.1978). Amicus Tulalip Tribes is a political successor in interest to tribes, bands or groups of Indians which were parties to the Treaty of Point Elliott. *United States v. Washington*, 459 F.Supp. 1020, 1039 (W.D.Wash.1978).

**5.** The Final EIS states that, if the Marina is constructed as proposed, one probable adverse effect which could not be avoided would be

> a reduction in area of a portion of one of the fishing areas within the Muckleshoot and Suquamish Tribes' usual and accustomed fishing areas as defined in *United States v. Washington* 384 F.Supp. 312 (DCWA 1974). This re-

the general area of Puget Sound (of which Elliott Bay is a part) has been determined to be a usual and accustomed fishing place of the Muckleshoot and Suquamish Tribes, *United States v. Washington*, 384 F.Supp. 312, 367 (DC WA 1974); ... *United States v. Washington*, 459 F.Supp. 1020, 1049 (DC WA 1978). ROD, at 48; *see also* ROD, at 38, 40, 41, Appendix A, at 7; AROD, at 43–44; Final EIS, Figures 24 and 25 ("Adjudicated Usual and Accustomed Fishing Places" of Tribes), at 137–38, 211.[6] In the AROD, the District Engineer concludes: "My determination is that the area to be occupied by the marina is part of a usual and accustomed 'ground'." AROD, at 49. The National Marine Fisheries Service and the Department of the Interior agree that the Marina construction will cause the loss of part of the Tribes' usual and accustomed fishing places, and the National Marine Fisheries Service specifically calls the area to be eliminated "usual and accustomed fishing grounds". Administrative Record, at D–481 (letter of June 9, 1987).

The issue presented in this case is whether the defendants can eliminate a part of the Tribes' usual and accustomed fishing ground (and their right of access to that ground) under the Treaty of Point Elliott and cases construing that right, without an act of Congress. In considering this issue, the Court has reviewed materials submitted outside the administrative record, in addition to the record. *See No Oilport! v.*

*Carter*, 520 F.Supp. 334, 346 (W.D.Wash. 1981).

### 2. *The Treaty Provides the Tribes a Right of Taking Fish.*

The cases discussed by the parties emphasize a broad protection for treaty fishing rights. *See, e.g. Fishing Vessel*, 443 U.S. at 679, 99 S.Ct. at 3071, 61 L.Ed.2d at 841–42. The following principles in these cases directly govern the Court's decision here.

By treaty, the Tribes granted rights to the citizens of the United States and reserved rights to themselves, including the right to take fish from their off-reservation usual and accustomed fishing places in common with other citizens. *United States v. Winans*, 198 U.S. 371, 381–82, 25 S.Ct. 662, 664–65, 49 L.Ed. 1089, 1092 (1905). The Tribes' right to take fish is a property right, protected under the fifth amendment. *See, e.g., Menominee Tribe of Indians v. United States*, 391 U.S. 404, 411 n. 12, 412, 88 S.Ct. 1705, 1710 n. 12, 1711, 20 L.Ed.2d 697, 702 n. 12, 703 (1968) [hereinafter *Menominee Tribe* ].

The treaty must be interpreted in the sense in which its words would have been understood by the Indians. *Fishing Vessel*, 443 U.S. at 676, 99 S.Ct. at 3069, 61 L.Ed.2d at 839.

The United States has a fiduciary duty and "moral obligations of the highest responsibility and trust" to protect the Indi-

---

duction would increase somewhat the effort necessary to harvest that portion of the fisheries resource allotted to the tribes. As a result of increased recreational boat traffic generated by the marina, there could be increased conflict between recreational boats and Indian fishing activities, which could result in increased net damage.
Final EIS, at 268.

**6.** The Tribes' usual and accustomed fishing places are defined in *Boldt I*, 384 F.Supp. at 367 (Muckleshoot Tribe); 459 F.Supp. at 1049 (Suquamish Tribe). These definitions include Puget Sound as a usual and accustomed fishing place for both Tribes.

*Boldt I* defines the terms "grounds," "stations," and "usual and accustomed":

"Stations" indicates fixed locations such as the site of a fish wier or a fishing platform or some other narrowly limited area; "grounds" indicates larger areas which may contain nu-

merous stations and other unspecified locations which in the urgency of treaty negotiations could not then have been determined with specific precision and cannot now be so determined. "Usual and accustomed," being closely synonymous words, indicate the exclusion of unfamiliar locations and those used infrequently or at long intervals and extraordinary occasions. Therefore, the court finds and holds that every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters, is a usual and accustomed ground or station at which the treaty tribe reserved, and its members presently have, the right to take fish.
384 F.Supp. at 353.

ans' treaty rights. *Seminole Nation v. United States*, 316 U.S. 286, 297, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480, 1490 (1942).

■ The right to take fish at all usual and accustomed fishing places may not be abrogated without specific and express Congressional authority. Although the State may not qualify the right, it has authority under its police power to regulate the manner of fishing, the size of the take, the restriction of commercial fishing, and the like, *in the interest of conservation. Puyallup Tribe v. Washington Game Dept.*, 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 689, 693–94 (1968) [hereinafter *Puyallup I*].

The right to take fish at all usual and accustomed fishing places has a "geographic" aspect and a "fair share" aspect. The Tribes' right to take a fair share of fish in common with other citizens does not displace their right of access to fishing places. *United States v. Oregon*, 718 F.2d 299, 304 & n. 6 (9th Cir.1983) (citing *Puyallup I*, 391 U.S. at 398, 88 S.Ct. at 1728, 20 L.Ed.2d at 693–94, and *Fishing Vessel*, 443 U.S. at 667, 99 S.Ct. at 3065, 61 L.Ed.2d at 834).

3. *The Treaty Fishing Right Is A Property Right Which May Not be Taken Without an Act of Congress.*

Article VI, cl. 2 of the United States Constitution provides that all treaties made under the authority of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby...." *United States v. Washington*, 384 F.Supp. 312, 330 (W.D. Wash.1974) [hereinafter *Boldt I*], *aff'd*, 520 F.2d 676 (9th Cir.1975), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), *substantially aff'd sub nom. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979).

The treaty secures a "right of taking fish." *Fishing Vessel*, 443 U.S. at 674, 99 S.Ct. at 3068, 61 L.Ed.2d at 838. Further, this right of taking fish is reserved at *all* usual and accustomed grounds. *Fishing Vessel*, 443 U.S. at 674, 99 S.Ct. at 3068, 61 L.Ed.2d at 838; *Boldt I*, 384 F.Supp. at 332. For purposes of this case, the Tribes have established from the evidence and the defendants concede that the proposed Marina will occupy the Tribes' usual and accustomed fishing grounds. The Tribes contend that the defendants' taking their fishing ground in these circumstances is impermissible without an act of Congress. In footnote 22 of their memorandum, they state:

The tribes do not claim the right to prevent construction of all developments located within the boundaries of their adjudicated usual and accustomed fishing grounds and stations. The actual locations where productive fisheries take place are relatively limited compared to the large areas of water which are within each tribe's adjudicated usual and accustomed areas. It is only where a development would actually interfere with fishing that the tribes believe their treaty rights prevent construction.

*See also* Administrative Record, at G–308 *et seq.*

In *Fishing Vessel*, 443 U.S. at 676, 99 S.Ct. at 3069, 61 L.Ed.2d at 839, the Court recognized that the treaty should not be construed by the technical meaning of its words, but in the sense in which the words would naturally be understood by the Indians. *See also Boldt I*, 384 F.Supp. at 334. The treaty is essentially a contract between two sovereign nations, the Indians and the United States, and the intention of the parties governs its interpretation. *Fishing Vessel*, 443 U.S. at 675, 99 S.Ct. at 3069, 61 L.Ed.2d at 839. The Court in *Fishing Vessel* recognized that access to the Indians' ancient fishing grounds is protected by the treaty. The Court said:

... and it is accordingly inconceivable that either party deliberately agreed to authorize future settlers to crowd the Indians out of any meaningful use of their accustomed places to fish.

*Fishing Vessel*, 443 U.S. at 676, 99 S.Ct. at 3070, 61 L.Ed.2d at 840.

As a result of substantial litigation concerning the nature and extent of these treaty rights, *e.g.*, *Puyallup I*, 391 U.S. 392, 88

S.Ct. 1725, 20 L.Ed.2d 689 (1968); *Washington Game Dept. v. Puyallup Tribe*, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973); *Puyallup Tribe v. Washington Game Dept.*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed. 2d 667 (1977); *Fishing Vessel*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *Boldt I*, 384 F.Supp. 312 (W.D.Wash.1974), the courts have approved the States' power to regulate off-reservation fishing activities of treaty tribe members "only to the extent necessary to protect the fishery resource." *Boldt I*, 384 F.Supp. at 401. Regulation of the time and manner of fishing, the size of the take, and the restriction of commercial fishing are all appropriate if necessary for conservation of the fish. *Puyallup I*, 391 U.S. at 398, 402 n. 14, 88 S.Ct. at 1728, 1730 n. 14, 20 L.Ed.2d at 693–94, 696 n. 14. Indeed, various tribes have voluntarily accepted restrictions on fishing rights. *United States v. Oregon*, 718 F.2d 299, 304 (9th Cir.1983). Apart from allowing States to limit fishing rights for purposes of conservation, however, no court has permitted the actual taking of access or taking of fishing grounds without an act of Congress.

In *United States v. Winans*, 198 U.S. 371, 381–82, 25 S.Ct. 662, 664–65, 49 L.Ed. 1089, 1092 (1905), the respondent had acquired title to property on the Columbia River and proposed using a "fish wheel" —a device which would catch salmon by the ton and destroy the Indians' right to fish from one of their "usual and accustomed" places. The *Winans* Court upheld the Indians' right of access to respondent's private property and remanded the case for the lower court to devise relief that would protect the Indians from total exclusion from the fishery. *Winans*, 198 U.S. at 384, 25 S.Ct. at 665, 49 L.Ed. at 1089.

The Court held:

> The right to resort to the fishing places in controversy was a part of larger rights possessed by the Indians, upon the exercise of which there was not a shadow of impediment, and which were not much less necessary to the existence of the Indians than the atmosphere they breathed. New conditions came into existence, to which those rights had to be accommodated. Only a limitation of them, however, was necessary and intended, not a taking away. In other words, the treaty was not a grant of rights to the Indians, but a grant of rights from them,—a reservation of those not granted.... Reservations were not of particular parcels of land.... The reservations were in large areas of territory, and the negotiations were with the tribe. They reserved rights, however, to every individual Indian, as though named therein. They imposed a servitude upon every piece of land as though described therein. There was an exclusive right of fishing reserved within certain boundaries. There was a right outside of those boundaries reserved "in common with citizens of the territory." ... And the right was intended to be continuing against the United States and its grantees as well as against the state and its grantees.

*Winans*, 198 U.S. at 381–82, 25 S.Ct. at 664, 49 L.Ed. at 1092–93.

In *Menominee Tribe*, 391 U.S. at 411 n. 12, 412, 88 S.Ct. at 1710 n. 12, 1711, 20 L.Ed.2d at 702 n. 12, 703 (1968) (citing *Lone Wolf v. Hitchcock*, 187 U.S. 553, 564–67, 23 S.Ct. 216, 220–22, 47 L.Ed. 299, 305–07 (1903)), the Court confirmed that the treaty right is a property right which may not be abrogated without specific and express Congressional authority. *See also Confederated Tribes of Umatilla Indian Reservation v. Alexander*, 440 F.Supp. 553, 555 (D.Or.1977) [hereinafter *Umatilla*]; *Boldt I*, 384 F.Supp. at 337–38 (stating that the treaty fishing right "may be limited or modified in any particular or to any extent by or with authority of Congress", and noting that Congress had never, as of that time, "exercised its prerogative to either limit or abolish Indian treaty right fishing"). Absent explicit statutory language, the United States Supreme Court has been "extremely reluctant to find congressional abrogation of treaty rights...." *Fishing Vessel*, 443 U.S. at 690, 99 S.Ct. at 3076, 61 L.Ed.2d at 849. If Congress does authorize taking the tribes' treaty rights, that loss must be compensated under the fifth amendment. *Menominee Tribe*, 391

U.S. at 407, 413, 88 S.Ct. at 1708, 1711, 20 L.Ed.2d at 700 & n. 4, 703; *Whitefoot v. United States*, 293 F.2d 658, 659 & n. 1, 155 Ct.Cl. 127 (1961), *cert. denied*, 369 U.S. 818, 82 S.Ct. 829, 7 L.Ed.2d 784 (1962).

In *Umatilla*, 440 F.Supp. at 553, cited by the Fish and Wildlife Service, ROD, at 8, and the Bureau of Indian Affairs, ROD, at 11, the Army Corps of Engineers planned to dam Catherine Creek for flood control, irrigation and recreation purposes. The Umatilla Tribes sought to enjoin the project, claiming that it would infringe on their fishing rights.[7] The evidence showed that the Indians ranged along Catherine Creek and fished in holes that were likely to harbor fish, and that the size, shape and location of those holes altered as the bed of the creek was changed by natural erosion and rockfall. However,

> [t]he passage of time and the changed conditions affecting the water courses and the fishery resources in the case area have not eroded and cannot erode the right secured by the treaties....

*Umatilla*, 440 F.Supp. at 555 (quoting *Boldt I*, 384 F.Supp. at 401).

Some of these fishing stations on the creek would have been inundated by the reservoir once the dam was created. The *Umatilla* court found that the flooding would deprive the Indians of their right to occupy the fishing stations and their right of access to the stations. The government had proposed a mitigation program to trap and haul chinook above the dam, but the *Umatilla* court rejected it: "Whatever the merits of the government's mitigation program, the treaty right to fish at all usual and accustomed stations will be destroyed as to those stations within the reservoir." *Umatilla*, 440 F.Supp. at 555. The court granted the tribes relief in the form of a declaratory judgment requiring specific Congressional authority before the dam could be built.

In *United States v. Oregon*, 718 F.2d 299 (9th Cir.1983), the States of Oregon and Washington appealed a preliminary injunction preventing them from restricting treaty fishing in the upper two (out of three) pools of a 130-mile zone of the Columbia River. The proposed restriction would have allowed the Indians to fish in the bottom 21.6 miles of the zone and in one hatchery. *Oregon*, 718 F.2d at 301-02. The court recognized that the treaty fishing right has two discrete aspects—the geographical aspect (citing *Puyallup I*, 391 U.S. at 398, 88 S.Ct. at 1728, 20 L.Ed.2d at 693-94), and the guarantee of a proper quota of fish (citing *Fishing Vessel*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823). *Oregon*, 718 F.2d at 304 & n. 6. Discussing the Supreme Court's recognition of these two aspects in *Fishing Vessel*, the Ninth Circuit stated:

> [t]he tribes' right to some share of fish did not displace their right of access to fishing places. The Court's reasoning undermines any argument that the States need only supply the tribes a proper portion of the fish.

*Oregon*, 718 F.2d at 304 n. 6.

Although the *Oregon* court acknowledged that it could foresee instances in which limitations on the tribes' right of geographical access would be proper for conservation purposes without violating the treaty, in the circumstances of that case, the conservation purposes offered by the States did not justify the severe erosion of the tribes' treaty fishing right. The Ninth Circuit stated that in determining what limits, if any, might be placed on the geographical treaty fishing right to preserve the resource,

> the court must accord primacy to the geographical aspect of the treaty rights and invoke only such limits as required by the "comfortable margin" that sound conservation practices dictate.

*Oregon*, 718 F.2d at 305.

The source of the rule that fishing rights may be so limited is *Puyallup I*, where the Supreme Court stated:

> of fishing locations as the phrase "grounds and stations" in the other Northwest Indian treaties. *Umatilla*, 440 F.Supp. at 555.

---

**7.** The treaty at issue gave the tribes fishing rights only in stations, not grounds; however, the court found that the term "stations" in that treaty was intended to designate the same kinds

The right to fish "at all usual and accustomed" places may, of course, not be qualified by the State, even though all Indians born in the United States are now citizens of the United States. But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians.

*Puyallup I,* 391 U.S. at 398, 88 S.Ct. at 1728, 20 L.Ed.2d at 693–94 (citation omitted); *see Fishing Vessel,* 443 U.S. at 682, 99 S.Ct. at 3072, 61 L.Ed.2d at 843;[8] *Boldt I,* 384 F.Supp. at 333, 337. The court in *Boldt I* further stated that the State's power to regulate for conservation purposes "does not include the power to determine for the Indian tribes what is the wisest and best use of their share of the common resource." *Boldt I,* 384 F.Supp. at 402; *see also United States v. Washington,* 626 F.Supp. 1405, 1438 (W.D.Wash.1985).

In the present case, none of the defendants contend that the construction of the Marina and the consequent elimination of a portion of the Tribes' usual and accustomed fishing grounds are reasonable and necessary measures for conservation of the fishery, although the project includes mitigation and habitat enhancement measures. No authority has been cited to this Court suggesting that the defendants in this case have rights or powers that exempt them from the above principles. The federal, City and private defendants here do not have the ability to qualify or limit the Tribes' geographical treaty fishing right (or to allow this to occur through permits) by eliminating a portion of an Indian fishing ground for a purpose other than conservation.

Relying on *Fishing Vessel,* the Marina Group and federal defendants contend that construction of the Marina will not impair the Indians' treaty rights because they can still attain a "moderate living" by collecting their share of fish elsewhere. *Fishing Vessel* holds that the treaty right to take fish secures no more than is necessary to provide the Indians with a moderate living. *Fishing Vessel,* 443 U.S. at 686, 99 S.Ct. at 3074, 61 L.Ed.2d at 846. However, as the federal defendants recognize, the Supreme Court, in making this statement, clearly was addressing the "fair share" aspect of the treaty fishing right. The Tribes' fishing grounds in Elliott Bay are protected under the treaty right of access to those grounds (the "geographical aspect"), which is not displaced by the right to some share of fish and is not met by supplying the Tribes with a proper portion of fish. *Oregon,* 718 F.2d at 304 n. 6. The District Engineer's determination that construction of the Marina will not impair the Tribes' ability to meet their moderate living needs, AROD, at 50–51, even if accurate, does not circumvent the requirement of congressional authorization for such a taking, nor does it compensate for the conceded loss of the Tribes' usual and accustomed fishing grounds. Similarly, the existence of other areas in Elliott Bay where the Tribes may fish, the productive value of which is disputed, does not compensate for taking or permitting the taking of the fishing area within the Marina site.

The Marina Group further argues that the Tribes have "meaningful use" of their usual and accustomed fishing areas when they still have the ability to harvest fish from other parts of their usual and accustomed fishing places, to the extent necessary to attain a moderate living. *See Fishing Vessel,* 443 U.S. at 676, 99 S.Ct. at 3069, 61 L.Ed.2d at 840. The Marina Group's reliance on the phrase "meaningful use" to support the actual loss of part of a usual and accustomed fishing ground collapses the right of access into the right to a fair share of fish, which this Court may not do. *See Oregon,* 718 F.2d at 304; *Fishing*

---

**8.** In *Fishing Vessel,* the Court reaffirmed that the treaty guarantees Indians more than simply the "equal opportunity" to catch fish along with all other citizens and that treaty fishermen, unlike nontreaty fishermen, are "immune from all regulation save that required for conservation." *Fishing Vessel,* 443 U.S. at 682, 99 S.Ct. at 3072, 61 L.Ed.2d at 843 (citing *Puyallup I,* 391 U.S. at 398, 88 S.Ct. at 1728, 20 L.Ed.2d at 693–94).

*Vessel,* 443 U.S. at 667, 675, 99 S.Ct. at 3065, 3069, 61 L.Ed.2d at 834, 839.

Moreover, the District Engineer admits hardship to the Tribes in that, even if measures are taken to permit them to catch the same number of fish in remaining areas (for example, extending the fishing season), "there would be an increase in the amount to [sic] time required to catch the same number of fish and resultant increased costs." AROD, at 28; *see also* Final EIS, at 214, 268. The *Oregon* case and the Supreme Court cases cited therein prohibit such an attempt to compensate for loss of access by supplying more fish.

The Marina Group and the federal defendants contend that the Marina will not preclude the Tribes' meaningful use of the fishing area because the project will occupy one-eighth of one square mile of Puget Sound, or a fraction of one percent of the Tribes' usual and accustomed Puget Sound fishing areas. *See* AROD, at 51. In support of this argument, the Group cites evidence that the fishing in the area off the Duwamish Head accounts for 80% of the Muckleshoot Tribe's total catch, Final EIS, at 79, and that this Tribe's most successful fishing location is outside of Elliott Bay. Abercrombie Affidavit, at para. 18.

The Tribes dispute the defendants' assessment of the impact as minimal. Moreover, during the permit proceedings, the National Marine Fisheries Service, the Bureau of Indian Affairs, and the Fish and Wildlife Service notified the Corps that they concluded the loss to the Tribes was serious and, as the latter two agencies stated, not authorized by Congress. Even the Corps agrees that fishing is limited to a few areas in Puget Sound, Final EIS, at 136, and that the impact of the proposed elimination will be "substantial." Administrative Record, at H–111 (evaluation dated October 28, 1987).

No case has been presented to this Court holding that it is permissible to take a small portion of a tribal usual and accustomed fishing ground, as opposed to a large portion, without an act of Congress, or to permit limitation of access to a tribal fishing place for a purpose other than con-servation. In *Umatilla,* the court refused to permit an unauthorized taking of some, not all, of the fishing stations which would be flooded by the proposed dam's two and one-half mile reservoir on Catherine Creek. 440 F.Supp. at 555. In *Oregon,* the States' proposed restriction of treaty fishing would have eliminated two pools in the upper half of the Columbia River zone at issue, and left the tribes access to a 21.6–mile pool and one hatchery. 718 F.2d at 301–02. In *Winans,* one fishing station on the Columbia River was at issue. 198 U.S. at 371, 25 S.Ct. at 662. In each of these cases, the court did not allow the tribes' right of access to their usual and accustomed fishing places to be impaired, limited or eliminated and did not indicate that the extent or amount of damage to the property right was a factor to weigh in reaching its decision.

In circumstances similar to those presented here, the Supreme Court of British Columbia, Canada, recently held that the construction of a proposed marina in a bay on the east coast of the Saanich Peninsula on Vancouver Island "would diminish in extent the fishery (i.e. the fishing ground) contractually reserved" to predecessors of the plaintiff Indian band. *Saanichton Marina Ltd. v. Claxton,* No. 85/2872, slip op. at 2, 11 (S.Ct. B.C. Oct. 8, 1987) (Administrative Record, at H–124, H–133). The Canadian court found that the treaty between the Indians and the Hudson Bay Company, acting on behalf of the Crown, slip op. at 12 (H–123), reserved to the Indians "the right to carry on fisheries as formerly.... I think the words must mean that the Indians will have resort to traditional fishing grounds." *Saanichton Marina,* slip op. at 8 (H–127). The court concluded that the treaty (the "Deed") protected the Indians' right to the whole fishery, not just some part. *Saanichton Marina,* slip op. at 11, 14 (H–121, H–124).

The Court finds that in the circumstances presented in this case, the proposed elimination of a portion of the usual and accustomed fishing ground where the Marina is to be built will deny the Tribes access to their usual and accustomed fishing ground,

and the loss to the Tribes will be substantial. In the area between Four Mile Rock and Pier 91, where the Marina is to be constructed, the range of harm is estimated to be from 27% to over 40%. The Court concludes that the Tribes have demonstrated a strong probability of success on the merits of their treaty right claim.

### B. *Irreparable Injury*

Based on the above, and considering the strength of the Tribes' showing of success on the merits of their treaty right claim, the Court concludes that the Tribes have also satisfied their burden of showing a possibility of irreparable injury to their treaty fishing right. The treaty is "the supreme Law of the Land; and the Judges in every State shall be bound thereby ..." U.S. Const. art. VI, cl. 2. The treaty clearly secures to the Tribes the right of access and the right to fish in the area now proposed to be eliminated by the construction of the Marina. The treaty fishing right cannot be impaired or limited without an act of Congress. Yet if construction of the Marina proceeds, the right in this case will be lost.

The Court finds the defendants' suggestion that either the Marina could later be removed or the Tribes could be compensated in money to be without merit. The treaty fishing right is a property right protected under the fifth amendment, and the harm to this right cannot be measured solely in terms of the amount of lost income the Tribes might suffer. *Boldt I*, 384 F.Supp. at 404 ("the treaty rights that are asserted are unique and the damages which have been or will be sustained are not susceptible of definite monetary determination"). If the Tribes are to be compensated for a taking of their fishing ground, Congress must first authorize the taking. Although the Tribes have no adequate remedy for the threatened injury to their treaty rights, the defendants have the remedy of seeking Congressional authorization for their proposed actions.

### C. *Balance of Hardships*

Having demonstrated a strong probability of success on the merits and the possibility of irreparable injury, the Tribes have shown all that is necessary for a preliminary injunction to issue. Nevertheless, the Court has considered and balanced the hardships in this case. *See Chalk*, 840 F.2d at 710; *Los Angeles Memorial Coliseum*, 634 F.2d at 1203–04.

The Court recognizes the substantial desire of the citizens to build a Marina in Puget Sound, the lengthy process that has already occurred to evaluate the impact on the environment and the significant harm that may occur to nearby Magnolia residents if the Marina is not constructed. The Court also recognizes the tension between the claimed damages and benefits which will result from the construction or enjoining the construction of the Marina. The Court acknowledges that the Marina Group will suffer significant financial harm if a preliminary injunction is entered at this time. This is highly regrettable, but unlike the loss of rights guaranteed by treaty and protected under the Constitution, financial harm is not usually considered irreparable in the equitable sense. *See Los Angeles Memorial Coliseum*, 634 F.2d at 1202.

### D. *Public Interest*

Significant numbers of individuals are interested in the development of the Marina. However, the enforcement of rights that are reserved by treaty to the Tribes is an important public interest, and it is vital that the courts honor those rights. The Court has determined that the public interest will be served in this instance by granting the preliminary injunction.

## IV. NEPA VIOLATIONS

The Tribes contend that the Corps failed to discuss, analyze and evaluate measures to mitigate the adverse impacts of the Marina project on their treaty fishing right. They further claim the Corps failed to discuss, analyze and evaluate the cumulative impacts of the proposed Marina on their fishing activities and on the continuing loss of intertidal habitat. The Tribes contend that these alleged flaws in the EIS render it inadequate under NEPA.

Because the Court has determined that a preliminary injunction should issue on the Tribes' treaty right claim, it is not necessary to address the allegations of NEPA violations at this time. The remaining claims will be resolved when this action is determined on the merits.

## V. CONCLUSION

Under the Treaty of Point Elliott, the Tribes are entitled to a preliminary injunction to secure to them, pending a final determination of this litigation, their right of taking fish at their usual and accustomed fishing ground in the area where the Marina is to be built. The Court concludes that the Tribes have demonstrated a strong likelihood of success on the merits of their claim of a treaty right violation and a substantial possibility of irreparable injury, justifying a preliminary injunction to preserve the status quo. Now, Therefore,

IT IS ORDERED as follows:

1. Plaintiffs have met the applicable legal standard for obtaining a preliminary injunction; therefore, the Court GRANTS the motion for a preliminary injunction.

2. This preliminary injunction is binding on the parties to the action, their officers, agents, servants, employees, and attorneys, and on those persons in active concert or participation with them who receive actual notice of this order. Fed.R.Civ.P. 65(d).

3. Defendants Elliott Bay Marina Group and David M. Abercrombie are directed to cease all activities relating to the construction of the Marina.

4. Defendants the City of Seattle, the United States Department of the Army Corps of Engineers, Col. Philip L. Hall (District Engineer for the Seattle District of the United States Army Corps of Engineers), and John O. Marsh (Secretary of the Army) are each enjoined from taking any action to permit or allow any activities related to furthering the construction of the Marina.

5. The preliminary injunction shall remain in effect until a decision on the merits of plaintiffs' complaint has been reached.

The Court will set an early trial date to resolve these issues.

6. The Tribes are required to post a bond. Fed.R.Civ.P. 65(c); *Squaxin Island Tribe v. Washington,* 781 F.2d 715, 723–24 (9th Cir.1986). A hearing on the amount of the bond is set for Friday, July 8, 1988, at 2:00 p.m.

7. The Marina Group has begun dredging and filling, and sediment may have recently been discharged into Elliott Bay. Plaintiffs, in their motion for a temporary restraining order, filed on June 30, 1988, ask that the Court order the Marina Group and David M. Abercrombie to halt dredging and filling and to prevent further sedimentation by stabilizing the fill placed so far. Plaintiffs have given written notice of their motion for a temporary restraining order to the parties. The Court DENIES plaintiffs' motion for a temporary restraining order requiring the defendants to cease any dredging or filling unrelated to the Marina or otherwise to stabilize the fill, and sets a hearing for the defendants to respond to this additional relief requested, on Friday, July 8, 1988, at 2:00 p.m. All briefs and affidavits relating to this issue should be filed by Thursday, July 7, 1988.

IT IS SO ORDERED.

## ON DETERMINATION OF BOND AND FOR TEMPORARY RESTRAINING ORDER

THIS MATTER comes before the Court on two issues: (1) determination of an appropriate bond to be posted by plaintiffs Muckleshoot Indian Tribe and Suquamish Indian Tribe ("the Tribes") as a result of the Court's preliminary injunction previously entered in this case and (2) resolution of questions raised by the Tribes' motion for a temporary restraining order to prevent the defendants from carrying out any activities furthering construction of the proposed Marina and, in addition, to order defendants Elliott Bay Marina Group and David Abercrombie (collectively referred to herein as "the Marina Group") to take affirmative action to prevent further sedimentation by stabilizing the fill previously placed in the vicinity of the proposed Marina. The par-

ties have submitted additional pleadings responsive to these issues. Having reviewed all documents and materials relating to the above questions, the Court has concluded that the Tribes must post a bond and that the Court should not require the defendants to perform any additional acts in the area of the proposed Marina site.

## A. *Bond*

The Court has the discretion to impose a nominal bond or no bond in the circumstances presented. *See, e.g., People of California ex rel. Van de Camp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325, *amended on other grounds*, 775 F.2d 998 (9th Cir.1985); *Walker v. Pierce*, 665 F.Supp. 831, 843–44 (N.D.Cal.1987). The Court finds that the Tribes do not have the financial ability or resources to post a substantial bond and that requiring one would effectively deny them access to judicial review. The Court has previously concluded that the Tribes have a strong likelihood of success on the merits of their treaty right claim. This factor supports the decision to require a nominal bond or no bond. *People ex rel. Van de Camp*, 766 F.2d at 1326. Further, the Court has found that the Tribes' rights under their treaty are important substantive rights which the Court must protect pending the final outcome of this litigation.

Accordingly, the Court orders the Tribes to post a bond in the amount of $5,000. The bond shall be filed by Tribes on or before July 15, 1988 or the Court's preliminary injunction will be vacated.

## B. *Clarification of Homeowners' Position*

Under the preliminary injunction now in effect, intervenors Baggott, Troberman, Stulgis, Anderson, LaFollette and Stern ("homeowners") are not enjoined from taking any action which they deem necessary to protect their property. In the Court's view, the homeowners' position is no different now than it was prior to the entry of the preliminary injunction.

## C. *Denial of Additional Relief Requested in Motion for TRO*

Prior to the Court's issuance of a preliminary injunction, certain construction activity had commenced in the vicinity of the proposed Marina site relating to the replacement of a Metro sewer line and the placing of fill in the general area of the sewer line. However, further work is necessary to stabilize the fill, to construct a containment diking system to keep the fill in place, to stabilize Magnolia bluff, and to protect the sewer line. The City of Seattle now asks this Court to order the Marina Group to stabilize the sewer line and the fill currently in place, as outlined in the Declaration of Matthew M. Lampe filed on behalf of the City. The City asks that the cost of this stabilization be included in the amount of the injunction bond. The Tribes also request that the Court issue a temporary restraining order requiring the Marina Group to prevent further sedimentation now occurring due to wave action on the fill that has been recently placed. The Marina Group objects to being ordered to take such affirmative action, stating that it is unreasonable and inequitable to require the Group to conduct additional work at the project site when the Marina development has been enjoined and additional financing for the project has thereby been precluded. The Marina Group, through its managing partner David Abercrombie, has stated in open court that it would complete the siltation slope to stabilize the fill that has been recently placed in the area as shown in the exhibit titled "Present Status", attached to the Declaration of Mr. Lampe.

The Court finds that it is not appropriate to order the Marina Group or the other defendants to take any further action in the area of the proposed Marina. The intent of the preliminary injunction is to restrain the defendants from constructing the proposed Marina, and this was the subject matter of the Tribes' original motion for a preliminary injunction. The Court did not intend by its preliminary injunction to restrain the defendants from taking any action which is appropriate or necessary to protect the fill already placed, to finish stabilizing the fill with a siltation curtain,

to cover or otherwise stabilize the new Metro sewer line, to stabilize Magnolia Bluff or to accomplish in some other manner the work generally outlined in any of the alternatives described in the Lampe Declaration. The Court notes that erosion, siltation and sedimentation in the area have been ongoing problems for a substantial period of time and are unrelated in any way to the Tribes' present action or to the issuance of a preliminary injunction to halt construction of the Marina.

NOW, THEREFORE,

IT IS ORDERED as follows:

1. The Tribes are ordered to post a bond in the amount of $5,000 on or before July 15, 1988, or the preliminary injunction presently in effect will be vacated;

2. The Tribes' motion for a temporary restraining order and the City's request that this Court require the defendants to perform additional acts in the area of the proposed Marina site are DENIED.

3. The Court's preliminary injunction previously granted in this case is clarified to state that nothing stated therein shall prohibit any of the parties from taking any action other than the construction of the proposed Marina. Any activity relating to stabilizing the siltation slope facing, stabilizing or covering the Metro sewer line or otherwise taking any action described in the alternatives set forth in the Lampe Declaration is permitted.

IT IS SO ORDERED.

ON MOTION FOR RECONSIDERATION

THIS MATTER comes before the Court on the motion of defendants the City of Seattle, Elliott Bay Marina Group ("Marina Group"), and Intervenors–Homeowners (collectively referred to as the "Seattle defendants") for reconsideration of the Court's Order Granting Preliminary Injunction ("Order"), entered on July 5, 1988. Defendant David M. Abercrombie, managing partner of the Marina Group, filed a responsive memorandum in support of the motion. Defendants the United States Department of the Army Corps of Engineers, Col. Philip L. Hall, and John O. Marsh (collectively referred to as the "federal defendants" or the "Corps") also filed a memorandum in support of the motion. Having considered the motion, together with the memoranda and exhibits submitted by counsel, the Court DENIES the motion to reconsider and declines to vacate the preliminary injunction.

DISCUSSION

A. Purpose of the Preliminary Injunction

The Court granted a preliminary injunction in this case in order to preserve the status quo because the Court found that the Tribes had shown a combination of *probable* success on the merits and the *possibility* of irreparable injury if the injunction was not granted. The Court further found that the Tribes' treaty rights claim raised serious questions and the balance of hardships tipped in their favor. Order, at 30–32; *see, e.g., Chalk v. United States Dist. Court,* 840 F.2d 701, 704 (9th Cir.1987).

The defendants seem to treat the Order as a final resolution of the evidence in the record, which it is not. A party is not required to prove his case in full at a preliminary injunction hearing. At this stage, it is generally inappropriate for the court to give a final judgment on the merits. Rather, "[t]he purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175, 180 (1981); *see also* Fed.R.Civ.P. 65(b) ("any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial" and may be considered by the factfinder then).

A party is not entitled to reconsideration based on "new facts" or theories which were clearly available to that party at the time of the earlier ruling. *Fay Corp. v. BAT Holdings I, Inc.,* 651 F.Supp. 307, 308 (W.D.Wash.1987). Nor are "after thoughts" appropriate bases for reconsideration. *Fay Corp.,* 651 F.Supp. at 309. The

facts and theories raised by defendants were clearly available to them at the time of the hearing and are not grounds for reconsideration.

Notwithstanding the finding that the defendants have not met the standard for reconsideration, the Court has considered the issues raised by the defendants because of the importance of the claims to all parties to this litigation. In summary, the record demonstrates significant disagreement over the extent of damage to the Tribes' treaty fishing rights as a result of the construction of the Marina; however, there is substantial evidence that some loss of an adjudicated fishing ground and damage to the Tribes' right of access to fish there will probably occur if the Marina is built. Applying the standard for granting a preliminary injunction to the record presented by all parties, the Court granted preliminary relief to preserve the status quo pending trial on the merits of this case.

B. Defendants' Contentions

1. *The defendants do not concede that the Marina will have a substantial effect on fishing rights.*

The Seattle defendants contend that the statements in the Environmental Impact Statement ("EIS"), which the Order cited and relied on, were made "assuming very conservative projections" for the purpose of environmental review and should be distinguished from the Corps' findings in its permit decision. First, this argument implies, and Mr. Abercrombie explicitly argues in his own memorandum, that the Court should defer to the Corps' decision, as reflected in its issuance of the permit, to allow the Marina to be built, despite the statements in the EIS regarding the adverse or irreversible impact on the Tribes' fishing grounds. *See* Final EIS, at 263, 268. Second, the argument suggests that specific statements in the EIS are less authoritative than the Corps' resolution of the material and its ultimate decision to issue the permit.

a. *Deference to the Corps.* In the Order, the Court did not reach the Tribes' NEPA challenges, but addressed only the treaty rights claims. Thus, the deferential standard of review for NEPA challenges was not the appropriate approach and the Court did not apply that standard. As counsel for the federal defendants stated at the hearing on the motion for preliminary injunction, the treaty rights question is a legal issue which the court decides de novo. Transcript of Hearing, at 36–37; *see, e.g., United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905) (treaty right claims against private party); *United States v. Washington*, 384 F.Supp. 312, 328 (W.D.Wash.1974) [hereinafter *Boldt I*], aff'd, 520 F.2d 676 (9th Cir.1975), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), *substantially aff'd sub nom. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (treaty right claims against state government).

The Court considered the Corps' decision to issue the permit, together with the facts evaluated in the administrative record, including the EIS. The Court concluded that, as a matter of law under the authorities establishing and construing treaty fishing rights, the loss of a portion of the fishing grounds, *see* Final EIS, at 268, could not be permitted by the Corps or the City or accomplished by the Marina Group without an act of Congress. The evidence presented by all parties showed an actual impact of the Marina on the fishing grounds, but a dispute over the extent of the impact—the injury to the Tribes' right of access to the grounds as well as the financial injury (which alone would *not* be irreparable harm). *See* Order, at 4–6.

b. *Credibility of statements in EIS.* The Court finds no distinction in the federal statutes and regulations between findings made for the purpose of environmental review and for issuing permits. The requirement that all federal agencies prepare an environmental impact statement is set forth in the National Environmental Policy Act, 42 U.S.C. § 4332(2); 40 C.F.R. § 1500 *et seq.* The statute requires:

a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

... and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).[1]

The EIS and the administrative record analyze a substantial amount of information concerning the amount of fishing at the Marina site. *See, e.g.,* ROD, at 38; Amendment to Record of Decision ("AROD"), at 49; Technical Appendix O, at 0–23–30; Final EIS, at 136, 212–14. The conclusions in the EIS are "[b]ased on the information provided by the permit applicants, the Indian Tribes, and WDF...." Final EIS, at 212.

The Court drew its own legal conclusions based on the record, as it is entitled and bound to do, for the purpose of determining whether a preliminary injunction should issue. The Court concluded that the alleged loss and injury to treaty fishing rights reach the level of probability and significance that at this time the defendants cannot lawfully proceed with the proposed elimination of this portion of a fishing ground.

c. *Misplaced reliance on parts of the administrative record.* The federal defendants point to specific references in the Order and contend that the Court's reliance is misplaced because those references are assumptions or opinions only, or are qualified or contradicted by other evidence in the record. As these defendants recognize and as the Order reflects, the evidence is conflicting. Order, at 3–12. It is not the Court's function to determine the final outcome of this evidence at this point, but rather to evaluate the probability of success on the merits, the possibility of irreparable harm, the seriousness of the questions, and the balance of hardships.

2. *The Order makes no distinction between grounds and stations and does not require the Tribes to prove that fishing was conducted at the Marina site at and before treaty times.*

The Seattle defendants contend that the Court's decision collapses Judge Boldt's distinction between grounds and stations. *Boldt I* defined the Muckleshoot Tribe's usual and accustomed fishing places to include "secondarily ... the saltwater of Puget Sound." 384 F.Supp. at 367. A later Boldt decision defines the usual and accustomed fishing places of the Suquamish Tribe to include "the marine areas of northern Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal." *United States v. Washington,* 459 F.Supp. 1020, 1049 (W.D.Wash.1978). The statement in *Boldt I* cited by the Seattle defendants that "occasional and incidental trolling was not considered to make the marine waters traveled thereon the usual and accustomed fishing grounds of the transiting Indians", 384 F.Supp. at 353, does not contradict the *Boldt I* court's findings including Elliott Bay within the usual and accustomed fishing places of the Tribes. 384 F.Supp. at 367; 459 F.Supp. at 1049.[2] Once the area has been defined as within the usual and accustomed fishing

---

1. The EIS was prepared by a "project team ... in the role of independent third party contractors, with the guidance and participation of the Corps of Engineers" and input from the Marina Group. The document contains a certification by the individual signing "that neither I nor other members of the project team have any financial or other interest in the outcome of this project." Final EIS, at vi. This certification complies with 40 C.F.R. § 1506.5(c) and ensures the impartiality of the statements in the EIS.

2. The record contains numerous references to the Marina site as a usual and accustomed fishing area or ground, based on the specific determinations in the Boldt decisions. *See, e.g.,* AROD, at 49; Final EIS, Figures 24 and 25. Counsel for the federal defendants stated at oral argument that these defendants do not dispute "that Area 10 and Elliott Bay are usual and accustomed fishing areas of the ... plaintiffs." Transcript of Hearing, at 37.

places, the cases do not require the Tribes to prove that they fished there at and before treaty times; that has been "adjudicated," as the record shows here.

The treaty secures a "right of taking fish, at all usual and accustomed grounds and stations...." *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 673, 99 S.Ct. 3055, 3068, 61 L.Ed.2d 823, 838 [hereinafter *Fishing Vessel*], *modified on other grounds*, 444 U.S. 816, 100 S.Ct. 34, 62 L.Ed.2d 24 (1979). The authorities do not support affording less protection to a fishing area because it is a ground rather than a station.

### 3. *The Order ignores substantial evidence in the record that the Tribes do not fish at the Marina site.*

The Boldt decisions' definition of Elliott Bay as within the Tribes' usual and accustomed fishing places framed the issue for the Court as stated in the Order. Order, at 16. On a record reflecting variations in the assessed impact of the Marina on the amount of fishing possible and the range of harm to the Tribes' right of access, the Court found that the standards for issuing a preliminary injunction were satisfied. The Seattle defendants now in effect urge the Court to disagree with statements and conclusions of the preparers of the EIS, as well as evidence presented by the Tribes, and instead accept certain references on which these defendants rely to show there is no fishing in the vicinity of the Marina.

The Seattle defendants state, for example, that the Tribes' estimate of the catch of fish that will be lost is an inflated figure, 85% of which represents coho salmon catch. Because fishing for coho takes place in waters deeper than the Marina will extend, the Seattle defendants contend that an impact on coho fishing area is not possible and that the only actual impact will be a minor effect on chinook fishing.

Regarding coho fishing, evidence presented by the Tribes indicates that the area around the proposed Marina is a "prime coho fishing area", that the Tribes fish for coho directly in front of where the

Marina would be and that the breakwater and the increased boat traffic would probably interfere with fishing for this type. Declaration of Clifford Keeline, at para. 5; Declaration of James Barr, at para. 5; Declaration of Merle A. Hayes, at para. 11. The Tribes' expert, Philip A. Meyer, and the Corps differ in their estimates of the increase in boat traffic. Declaration of Philip A. Meyer, at paras. 6–7; AROD, at 28, 34.

Regarding the impact on chinook fishing, the Tribes presented substantial evidence that fishing in the area has been curtailed in recent years but that when the area is open, it is considered to be the prime chinook fishing area in outer Elliott Bay for Green–Duwamish chinook and one of the most highly valued productive sites for chinook fishing in Elliott Bay. *E.g.*, Declaration of Randy Hatch, at paras. 27–28, 34–35; Technical Appendix O & Appendix III, Correspondence.

The District Engineer based his determination that the impact of the marina on the Tribes' right of access would be "minimal" on his comparison of the area to be eliminated to the whole of the Tribes' usual and accustomed fishing places "or at the very most within Elliott Bay." AROD, at 49–50. This comparison does not provide an accurate evaluation of the impact, in light of the fact that the Tribes do not fish in every part of their usual and accustomed fishing areas and few fishing areas remain available. EIS, at 136; *see also* Final EIS, at 212; Order, at 28–29.

The Court did not hold that even if there are no fish in the area of the proposed Marina, the Tribes have an unqualified right of access to fish there. At this preliminary stage, the Court found credible and substantial the evidence that there could be a significant loss of the right to take fish from the area, which is impermissible without an act of Congress. *See Fishing Vessel*, 443 U.S. at 673, 99 S.Ct. at 3068, 61 L.Ed.2d at 838; *United States v. Oregon*, 718 F.2d 299, 304 & n. 6 (9th Cir.1983) (right of access is separate from the right to harvest a share of fish). The final determination of the nature and ex-

tent of the loss of fishing rights and whether this loss will ultimately preclude the development of the Marina must await the trial on the merits and the findings of the trier of fact on these issues. *See University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175, 180 (1981).

### 4. *Scope of Order.*

The federal defendants are concerned that the Order is not limited to usual and accustomed grounds and stations where the Tribes actually fish, but could encompass all development within Puget Sound. The Court's decision is limited to the facts presented. Order, at 30. The Court noted that the Tribes do not claim the right to prevent construction of all developments within their adjudicated usual and accustomed fishing grounds and stations, but only where a development would actually interfere with fishing. Order, at 19. The Order thus holds only that the Tribes have met the showing necessary for preliminary relief halting construction of the Marina at the proposed site. The defendants' objection to this decision because of possible implications for other future developments in unspecified locations is without merit.

### CONCLUSION

For the reasons stated above, the defendants' motion to reconsider and to vacate the preliminary injunction is DENIED. The preliminary injunction shall remain in effect pending trial on the merits.

IT IS SO ORDERED.