**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**STATE OF OREGON and State of
Washington, Defendants-
Appellants,**

**and**

**Confederated Tribes of the Warm Spring
Reservation, et al., Plaintiffs-
Intervenors-Appellees.**

Nos. 82–3556, 82–3604

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 6, 1983.

Decided Oct. 12, 1983.

Maria A. Iizuka, Dirk D. Snel, Dept. of Justice, Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., Charles H. Turner, U.S. Atty., George D. Dysart, Dept. of Justice, Portland, Or., for U.S.

Howard G. Arnett, Johnson, Marceau, Karnopp & Petersen, Bend, Or., Tim Weaver, Hovis, Cockrill, Weaver & Bjur, Yakima, Wash., for intervenor.

Dave Frohnmayer, Atty. Gen., Stanton F. Long, Deputy Atty. Gen., William F. Gary, Sol. Gen., Mary J. Deits, Asst. Atty. Gen., Salem, Or., for State of Or.

Kenneth O. Eikenberry, Atty. Gen., James M. Johnson, Sr., Asst. Atty. Gen., Dennis D. Reynolds, Asst. Atty. Gen., Olympia, Wash., for State of Wash.

Before SNEED, FARRIS, and CANBY, Circuit Judges.

SNEED, Circuit Judge:

The State of Oregon and the State of Washington bring this appeal from a now-expired preliminary injunction. The district court issued the injunction to allocate chinook salmon among treaty and nontreaty fishermen for the fall 1982 salmon run on the Columbia River. Although the parties seek to employ this appeal as the means by which a number of issues important to the management of the river fishery can be resolved, we decline to proceed entirely as the parties wish. Nonetheless, we are convinced that the expiration of the preliminary injunction does not moot this appeal. Approached in the fashion hereinafter indicated, we affirm the action of the district court.

## I.

### MATTERS IN DISPUTE

At issue is the right to take, and the need to protect and enhance, two types of fall chinooks, hatchery fish and the more desirable but vanishing wild salmon (brights). The hatchery fish are bred in the lower river, migrate to the ocean, and then return to the hatcheries. These fish, which do not spawn, exist in relative abundance. The brights, on the other hand, are born further upriver and return there to spawn and die. Less than half of those reentering the river reach their spawning grounds. The survival of the species is measured at any point in the river by the escapement, or number of fish passing that point. The parties agree that the escapement of brights in 1982 was dangerously low.

The disputes of the parties are not without antecedents.[1] The parties previously voluntarily agreed that nontreaty fishermen will fish in Zones 1–5, which comprise the lower 141 miles of the river and contain both hatchery fish and brights, and that treaty fishermen will use the 130-mile Zone 6, the upper half of the river. The upper two pools in Zone 6 contain only brights, but both hatchery fish and brights can be caught in the lowest pool of Zone 6.

The district court has had jurisdiction over the case since 1969. Some of the disputes were settled when the district court ordered the parties to formulate the Columbia River Management Plan. After the parties formulated the Plan the district court adopted it. The Plan allows inriver harvesting on a 60% treaty—40% nontreaty

---

1. To review the previous litigation, see Comment, Sohappy v. Smith: *Eight Years of Litigation over Indian Fishing Rights,* 56 Or.L.Rev. 680 (1977), and *United States v. Oregon,* 657 F.2d 1009 (9th Cir.1982).

basis[2] once the Bonneville Dam escapement exceeds 100,000 fish. The Plan does not establish fishing locations, times, or quotas. The States regulate such details through the Columbia River Compact, an interstate agency which controls commercial fishing on the river.

The disagreements over the fall 1982 allocations, out of which this suit arises, began in August 1982, when the Compact determined that the run of brights would be unacceptably low. The Compact restricted treaty and nontreaty fishing, allowing treaty fishermen five days of fishing in the bottom 21.6 miles of Zone 6, plus a week's fishing at one hatchery. The tribes were unhappy because they desired to fish all of Zone 6. As a result, they brought suit in the district court. The court decided that the restrictions on treaty fishing infringed a treaty right to fish at "usual and accustomed places" and was not necessary for perpetuation of brights. The court issued a temporary restraining order, later converted to a preliminary injunction, ordering two days of treaty fishing throughout Zone 6 and four days in the 21.6 mile pool. No changes of relevance to this appeal were made in nontreaty fishing.

The States appealed. Initially, we must determine whether the appeal has been mooted by expiration of the 1982 fishing season. Second, we must decide whether the district court erred in altering the fishing season to restore some of the tribes' "usual and accustomed places" of fishing. Finally, we must confront whether the district court's calculation of the deficit in the Indian share is clearly erroneous. We turn first to the mootness question.

## II.

### THE APPEAL IS NOT MOOT

■ A case is moot if the reviewing court can no longer grant effective relief. *Mills*

v. *Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895); *In re Combined Metals Reduction Co.,* 557 F.2d 179, 187–89 (9th Cir.1977). This customary description of mootness has reduced significance to litigation such as this which is but part of extensive ongoing judicial oversight of a continuous activity. What is decided in one proceeding in such litigation will impact on future, and perhaps even on past, proceedings. Even a failure to decide may cause significant reverberations. Moreover, even when the termination of litigation can be foreseen to be reasonably proximate to its commencement, it is said an exception to the mootness doctrine applies when the claim for relief is "capable of repetition, yet evading review" and the complaining party is likely to be subject to the same harm. *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 514–16, 31 S.Ct. 279, 283–84, 55 L.Ed. 310 (1911).

■ Without regard to whether the staying hand of mootness should be relaxed in "oversight litigation," the exception certainly applies to this case. Because the difficulty of forecasting the run of fish forces the district court to issue its orders as close as possible to the start of the fishing season, and because this conflict is certain to continue, the dispute over the allocation of fish can easily recur, yet evade review, between the same complaining parties. *See United States v. Oregon,* 657 F.2d 1009, 1012 n. 7 (9th Cir.1982) (appeal of injunction not moot for "enduring" issues of tribal immunity and jurisdiction after fishing season expired).[3] The calculation of the deficit in the treaty fishermen's share also does not present a moot issue, because

---

**2.** The allocation deviates from the 50%–50% starting point suggested by the Supreme Court in *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 685–87, 99 S.Ct. 3055, 3074–75, 61 L.Ed.2d 823 *modified on other grounds,* 444 U.S. 816, 100 S.Ct. 34, 62 L.Ed.2d 24 (1979), to compensate for ocean fishing by nonIndians.

**3.** *Compare Sohappy v. Smith,* 529 F.2d 570, 572–73 (9th Cir.1976) (per curiam) (appeal from order denying preliminary injunction to ban Indian commercial fishing moot when run had ended).

the deficit will be carried over into future allocations. And there is no evidence in the record that these issues have been mooted by a new Plan. Thus we turn to the merits.[4]

### III.

### THE FISHING RIGHT AND CONSERVATION

■ The parties by their arguments have sought to array the interest in conservation against the tribe's right to fish in "all the accustomed places." What type of showing of necessity springing from the need to conserve the fishery, the parties ask, is required to justify a limitation, spatially or temporally, on the tribes' "right to fish in all the accustomed places?" The question is a legal one and thus is subject to de novo review even though raised on appeal from a preliminary injunction. *California ex rel. Younger v. Tahoe Regional Planning Agency,* 516 F.2d 215, 217 (9th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975), *cited in Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1200 (9th Cir.1980).[5]

After extended reflection, however, we decline to attempt to resolve completely the broad question the parties pose. Our disposition will be considerably more narrow, addressing only certain aspects of the broader issue.

■ We begin by setting forth the common ground between the tribes and the States. All agree, as they must, that the tribes' fishing right encompasses access to traditional sites as well as a right to a fair share of the catch passing those sites. In ceding their territory to the United States, the tribes received a guarantee of the "right of taking fish, at all usual and accustomed places." As the district court held in *Sohappy v. Smith,* 302 F.Supp. 899, 911 (D.Or.1969), *history of subsequent orders omitted:*

> the state cannot so manage the fishery that little or no harvestable portion of the run remains to reach the upper portions of the stream where the historic Indian places are mostly located.
>
> . . . .
>
> . . . .
>
> [T]he protection of the treaty right to take fish at the Indians' usual and accustomed places must be an objective . . .

---

**4.** The States argue that the Plan deprives us of power to grant relief on the allocation of fish. They claim that the Plan provides an exhaustive list of requirements for fishing regulations and bars any attempt to rely on the right to fish at "all usual and accustomed places," a right the Plan does not mention. We disagree. The Plan expressly states that it does not govern all fishing rights. It provides that "significant management problems" will be sent to the district court, and that "[i]n any event" the district court retains jurisdiction over the case. Both provisions point to judicial resolution of unsettled questions. Furthermore, accepting the States' argument would permit the States, acting through the Compact, to determine all fishing details except those already in the Plan. Such a result is contrary to the Plan's goal of mutual agreement. The Plan does not prevent us from hearing this case. *See United States v. Oregon,* 657 F.2d 1009, 1016 (9th Cir.1982).

**5.** The States do not challenge the injunction as an abuse of discretion. The abuse of discretion standard governs the court's *application* of the legal standards for issuing an injunction. *See Sports Form, Inc. v. United Press Int'l, Inc.,* 686

F.2d 750, 752 (9th Cir.1982). *Zepeda v. INS,* 708 F.2d 355 (9th Cir.1983), can be read to suggest that questions of law also may be reviewed more deferentially than under de novo review when the appellate court analyzes a preliminary injunction. *See id.* at 359 ("At the preliminary injunction stage, the substantive law aspects of the district court's order will be reversed only if the order rests on an erroneous legal premise and, thus, constitutes an abuse of discretion; at the permanent injunction stage, we freely review all conclusions of law.") This statement accurately reflects our standard only to the extent that it refers to the legal standards for issuing an injunction. The standard for reviewing the law governing the merits is de novo. *See, e.g., Humboldt Oil Co., Inc. v. Exxon Co., U.S.A.,* 695 F.2d 386, 387–88 (9th Cir.1982) (preliminary injunction will be reversed if district court abused discretion *or* relied on erroneous legal premise). An error of law is often described as sufficient to show an abuse of discretion, *see Miss Universe, Inc. v. Flesher,* 605 F.2d 1130, 1133 n. 5 (9th Cir.1979), but there is no intent to suggest that errors of law should receive the deferential review granted other discretionary decisions.

co-equal with the conservation of fish runs for other users.

This decision was not appealed. *See Sohappy v. Smith,* 529 F.2d 570, 573 (9th Cir.1976) (per curiam). The Supreme Court also has recognized the geographical aspect of the treaty fishing right, *see Puyallup Tribe v. Department of Game (Puyallup I),* 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 2689 (1968) ("The treaty right is in terms the right to fish 'at all usual and accustomed places.' ... The right to fish 'at all usual and accustomed' places may, of course, not be qualified by the State .... "), in addition to the guarantee of a proper quota of fish.[6]

The parties also recognize that conditions can exist that require some limitation on the tribes' right to fish "at all usual and accustomed places." Indeed the tribes have voluntarily accepted several restrictions. They fish only in Zone 6 and have not challenged the district court's limitation of four of their fishing days to the lower 21.6 miles of the 130-mile zone. In addition, the tribes do not quarrel with the restriction on the number of days they can fish in the zone.

This acceptance of restrictions no doubt is in recognition that some limitations are needed to preserve the population of brights. Although during the 1982 season the continued existence of brights was not imperiled, the 1981 escapement of brights near the upper end of Zone 6 was only 21,000, a record low far short of the optimal figure of 40,000. It was estimated that even without fishing the 1982 escapement was not likely to exceed 26,000.

At this point both parties shrink somewhat from the logic of their concessions and take up rather widely divergent positions. The States insist that limitations on the right to fish at "all the usual and accustomed places" are justified when necessary to enhance the population of the brights and reduce the deficit owed the tribes. The States also claim that they should be able to dictate the geographical area for treaty fishing in order to increase the harvest of hatchery fish that would otherwise be wasted. If the treaty fishermen had fished only in the lower pools of Zone 6, the States claim, they would have caught many more hatchery fish, thus reducing the deficit owed to the tribes while increasing the harvest of hatchery fish.[7] The tribes, on the other hand, insist that limitations are permissible only when necessary to perpetuate the brights as a species. Put another way, only when the brights are in fact an endangered species, they insist, are such limitations permissible. And even then the tribes contend the limitations must be the least restrictive that are feasible. In substance, the States seek to enlarge the scope of the

---

**6.** The Court acknowledged that the fishing right has these two aspects when it established the guarantee of a "fair share" of the fish. *See Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823, *modified on other grounds,* 444 U.S. 816, 100 S.Ct. 34, 62 L.Ed.2d 24 (1979). Before reaching the fair share issue, the Court first agreed with the district court that "[i]t is perfectly clear ... that the Indians were vitally interested in protecting their right to take fish at usual and accustomed places, whether on or off the reservations ...." *Id.* 443 U.S. at 667, 99 S.Ct. at 3065. Only after recognizing this right did the Court go on to address the question of the share of fish reserved by the treaties. *See id.* at 675, 99 S.Ct. at 3069. The tribes' right to some share of fish did not displace their right of access to fishing places. The Court's reasoning undermines any argument that the States need only supply the tribes a proper portion of the fish. The reasoning indicates that the district court correctly modified the Compact's fishing season to effectuate the right of access.

Efforts to protect the tribes' right of access do not "discriminate" against nontreaty fishermen. State regulation is discriminatory only if it fails "to accommodate the rights of Indians under the Treaty and the rights of other people." *Department of Game v. Puyallup Tribe (Puyallup II),* 414 U.S. 44, 49, 94 S.Ct. 330, 333, 38 L.Ed.2d 254 (1973). The States are free to regulate their own citizens even if the treaties prevent them from so regulating the tribes. *See Fishing Vessel Ass'n,* 443 U.S. at 673 n. 20, 99 S.Ct. at 3068 n. 20.

**7.** Both the Compact's regulations and the preliminary injunction achieved the 60%/-40% treaty/-nontreaty distribution of all fish required by the Plan. Thus the overall allocation of fish is not at issue.

power to limit fishing for conservation purposes while the tribes seek to narrowly restrict it.

■ We refuse to accept either position as a proper statement of treaty rights and obligations. Clearly the tribes should not have their treaty right to fish in "all the usual and accustomed places" limited solely either to increase the harvest of hatchery fish, as opposed to brights, or to reduce the deficit owed to the tribes. While these purposes pursued vigorously would very likely increase the stock of brights, the price required to be paid by the tribes is too high. Either of these purposes once legitimated would tend, when implemented, to erode severely the geographical aspect of the tribes' treaty rights. On the other hand, we refuse to endorse the "endangered species" approach of the tribes. We can easily foresee instances in which limitations on the geographical aspect would be proper under the treaty even though extinction of the brights as a species was not imminent. Conservation, properly understood, embraces procedures and practices designed to forestall the imminence of extinction. Preserving a "reasonable margin of safety" between an existing level of stocks and the imminence of extinction is the heart and soul of conservation. Limitations on the geographical aspect of the tribes' treaty rights to promote that end are permissible.

■ The district court's injunction was not contrary to the position just stated. It rejected the position of the States and, although it appears to have approved that of the tribes, its order as well as that of the Compact was designed to increase the escapement of brights during the 1982 season over that of 1981. This is confirmed by the fact that an expert of the States admitted that the difference, from a conservation standpoint, between a season like that of the court and that of the Compact is too small to matter.[8] There was no showing by either of the parties that during the 1982

season the brights were threatened with imminent extinction.

This is as far as we need go in this disposition. The district court has substantial latitude in determining what limits, if any, to which the geographical treaty rights of the tribes should be subject in the light of an existing stock of brights. In determining what limits, if any, are necessary, the court must accord primacy to the geographical aspect of the treaty rights and invoke only such limits as required by the "comfortable margin" that sound conservation practices dictate. To attempt to be more precise on the basis of the record before us would be neither well informed action nor appropriate to the appellate function. In this case the district court in its injunction did not exceed the limits within which we think it was free to act. It recognized the primacy of the treaty rights while recognizing the claims of conservation also. We can properly ask no more under these facts. We reach this conclusion without undertaking to decide whether the Compact's regulations were "discriminatory" within the meaning of *Puyallup I.* The district court's adjustments of the Compact's regulation were within the limits we believe appropriate.

### IV.

### THE DEFICIT

■ Finally, we also affirm the district court's calculation of the deficit. Our comparison of the court's findings with the record does not leave us with the " 'definite and firm conviction that a mistake has been committed.' " *See Sports Form, Inc. v. United Press International, Inc.,* 686 F.2d 750, 752 (9th Cir.1982) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). We agree with the district court that the parties must take "sufficient

---

**8.** The States predict that the court increased the catch of brights by 1400. *Compare United States v. Oregon,* 657 F.2d 1009, 1016–17 (9th Cir.1982) (affirming ban on salmon fishing, on and off reservation, when species was endangered).

steps" to provide a more accurate count of the treaty and nontreaty catch.

AFFIRMED.