**NORTHWEST SEA FARMS, INC., Plaintiff,**

v.

**UNITED STATES ARMY CORPS OF EN-GINEERS, Colonel Donald T. Wynn, District Engineer, Corps of Engineers, Defendants.**

No. C94–1621C.

United States District Court, W.D. Washington.

May 8, 1996.

James M. Johnson, Olympia, WA, for plaintiff.

Brian C. Kipnis, U.S. Attorney's Office, Seattle, WA, David J. Kaplan, U.S. Department of Justice, Environment and Natural Resources Div., Washington, DC, for defendants.

Daniel Alan Raas, Raas, Johnsen & Stuen, P.S., Bellingham, WA, for amicus curiae Lummi Nation.

## ORDER

COUGHENOUR, District Judge.

This matter comes before the Court on Northwest Sea Farms, Inc.'s ("Northwest") Motion for Summary Judgment and the Corps of Engineers and Colonel Donald Wynn's (hereinafter collectively referred to as "the Corps") Cross Motion for Summary Judgment. The Lummi Nation and the Nooksack Tribe have been granted leave to appear amicus curiae. Pursuant to the request of the parties, oral argument was heard on May 8, 1996.

## I. GENERAL BACKGROUND

As the facts are extensively detailed in the memoranda of the parties and the Lummi Nation, the Court shall only briefly outline the factual and procedural history of this dispute.

Since the 1980's, Northwest has been involved in a project to operate a fish farm for the production of salmon in the waters of Puget Sound. The project would be comprised of a number of net pens to be placed in the Rosario Strait, west of the Lummi Islands and near the Lummi Rocks. The area required for anchorage would cover some 11.36 acres, while the total surface area coverage would not exceed 1.41 acres.[1] Department of the Army Permit Evaluation and Decision Document, at AR 299.

In 1992, the Corps denied Northwest's application for a required permit under § 10 of the Rivers and Harbors Act, 33 U.S.C. § 403 (1986). The denial was based upon a finding that the project would be against the public interest because it would conflict with the Lummi Nation's fishing rights at one of its usual and accustomed fishing places under the Treaty of Point Elliott. Department of the Army Permit Evaluation and Decision Document, at AR 311. The Corps' conclu-

sion was based upon two predicate findings from the record. First, the Corps found that the record established that members of the Lummi Nation presently fish the proposed site of the project on a "more than extraordinary basis." *Id.* at AR 308. Second, the Corps found that the record illustrated that the project would deny members of the Lummi Nation access to the site. *Id.* Accordingly, the Corps determined that, under the relevant legal precedent, the permit should be denied as infringing upon the Lummi Nation's treaty rights.

In addition to the § 10 permit, Northwest was also required to obtain a Substantial Development Permit and Conditional Use Permits under the State Shoreline Management Act, RCW 90.58.020, *et seq.* Initially, Northwest applied to Whatcom County for these permits. The matter was assigned to a hearing examiner who, after hearings in which the Lummi Nation participated, denied the permits. Whatcom County Hearing Examiner, Findings of Fact, Conclusions of Law, Decision and Permit, at AR 271. Among other considerations, the hearing examiner based this denial upon a finding that the project would interfere with the Lummi Nation's fishing rights. *Id.* at AR 268. Following this decision, Northwest moved for reconsideration. In denying the motion, the examiner again relied upon the potential impact of the project on Lummi Nation fishing. Whatcom County Hearing Examiner, Decision on Reconsideration, at AR 336. As with the initial hearings, the Lummi Nation participated in the review on reconsideration.[2]

Northwest appealed the decision of the examiner to the Shoreline Hearing Board ("SHB"). The Lummi Nation also filed a response in these proceedings. After considering the record before it, the SHB reversed the decision of the examiner and remanded for issuance of the permits. Shorelines

---

**1.** According to the site plans in the Public Notice of Application for Permits, the project would require .84 acres in total surface area coverage. U.S. Army Corps of Engineers, Public Notice of Application for Permits, at AR 316.

**2.** During the interim between the original denial and the denial of reconsideration, a final Environmental Impact Statement ("EIS") was issued.

This EIS found no significant environmental impacts. Prior to its issuance, the Corps was provided an opportunity to review and comment on a draft EIS. This EIS was also included in the record before the Corps and referenced in its decision to deny the § 10 permit. The Lummi Nation and Nooksack Tribe also provided comments to the EIS.

Hearing Board, Final Opinion, at AR 327. The SHB found that the project would not significantly interfere with commercial fishing in the area, including that of the Lummi Nation. *Id.* at AR 325. However, the SHB also expressly disavowed any consideration of Indian treaty rights, stating that such consideration was outside its jurisdiction. *Id.* at AR 324–25. Accordingly, the SHB found that "[s]ince the treaty issue is the County's basis for denying the permits, that decision should be reversed." *Id.* at AR 326. On remand, the state permits were issued.[3] However, the denial by the Corps stopped construction of the project.

Northwest filed this action for review of the Corps' decision under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.* Northwest asserts that the Corps wrongfully denied the § 10 permit because: (1) the Corps may not deny a § 10 permit based solely upon a determination that a project will be located in Puget Sound waters where a tribe has treaty fishing rights; (2) principles of res judicata bind the Corps and the Lummi Nation to previous determinations of "no significant impact on fishing;" (3) the Corps is bound by its own regulations to final state permitting and environmental determinations when it utilizes a coordinated review process; and (4) the Corps denied Northwest a fair hearing on the § 10 permit. Northwest requests that this Court declare that the proposed project complies fully with all applicable law and regulations and enjoin the Corps from refusing to issue the § 10 permit. The Corps moves for summary judgment that its decision must be upheld as consistent with the record and relevant legal precedent.

## II. STANDARD OF REVIEW

■ Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). Under the Rule,

summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ Judicial review of the Corps' decision is governed by the APA § 706(2) and limited to a review of the administrative record before the agency. *Friends of the Earth v. Hintz,* 800 F.2d 822, 828–29 (9th Cir.1986). In reviewing the record, the Court must determine whether the Corps' decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (1977). Factually, this deferential standard of review is a narrow one. The Court may not set aside the decision of the Corps unless there is no rational basis for the action in the record. *Hintz,* 800 F.2d at 831. Purely legal questions are reviewed de novo. *Howard v. FAA,* 17 F.3d 1213, 1215 (9th Cir.1994).

## III. ANALYSIS

### A. TREATY FISHING RIGHTS OF THE LUMMI NATION

In asserting that the Corps improperly denied the § 10 permit based upon its finding that the project would impinge upon treaty fishing rights, Northwest initially challenges the Corps' authority to consider such rights in making its permitting decisions. The Corps opposes this argument by asserting that the "trust relationship" between it and the Lummi Nation mandates consideration of treaty fishing rights.

The Supreme Court has recognized "the undisputed existence of a general trust relationship between the United States and the Indian people." *United States v. Mitchell,* 463 U.S. 206, 225, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983). This obligation has been interpreted to impose a fiduciary duty owed in conducting "any Federal government action" which relates to Indian Tribes. *Nance*

**3.** Northwest also obtained a federally required Final NPDES permit prior to the decision of the Corps.

*v. Environmental Protection Agency*, 645 F.2d 701, 711 (9th Cir.), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981), constitute "law to apply" consistent with *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). In previous cases, this Court has tacitly recognized that the duty extends to the Corps in the exercise of its permit decisions. *See e.g. Muckleshoot Indian Tribe v. Hall*, 698 F.Supp. 1504, 1523 (W.D.Wash.1988) (granting an injunction against the construction of a marina in consideration of the effect upon Indian treaty rights).

■■■ In carrying out its fiduciary duty, it is the government's, and subsequently the Corps', responsibility to ensure that Indian treaty rights are given full effect. *See e.g. Seminole Nation v. United States*, 316 U.S. 286, 296–97, 62 S.Ct. 1049, 1054–55, 86 L.Ed. 1480, 86 L.Ed. 1777 (1942) (finding that the United States owes the highest fiduciary duty to protect Indian contract rights as embodied by treaties). Indeed, it is well established that only Congress has the authority to modify or abrogate the terms of Indian treaties. *United States v. Eberhardt*, 789 F.2d 1354, 1361 (9th Cir.1986). As such, the Court concludes that the Corps owes a fiduciary duty to ensure that the Lummi Nation's treaty rights are not abrogated or impinged upon absent an act of Congress.

Despite the existence of this trust relationship, Northwest argues that the Corps' reliance upon the Lummi Nation's treaty rights is unauthorized by its own regulations. Northwest notes that the term "Indian treaty rights" cannot be found in the Corps' regulations concerning what constitutes a "public interest." Thus, Northwest asserts that the Corps is precluded from considering such rights in making its decision. The Court disagrees.

Northwest's argument is flawed in at least two important respects. First, Northwest's position ignores the duties imposed by the trust relationship owed by the Corps to the Lummi Nation. It is this fiduciary duty, rather than any express regulatory provision, which mandates that the Corps take treaty rights into consideration. Second, even if the Corps were not bound by the trust relationship, Northwest's argument assumes by negative implication that the Corps' regulations allow it to make permitting decisions which would alter Indian treaty rights. This interpretation, however, is directly contrary to the principle that only Congress has such power. Accordingly, the Court concludes that the Corps properly considered the Lummi Nation's treaty rights in its permit decision-making process.[4] Thus, the Court must next consider Northwest's alternative argument that the Corps incorrectly determined that the project would impinge upon the Lummi Nation's rights under the Treaty of Point Elliott.

Article V of the Treaty of Point Elliott provides:

> The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory … 12 Stat. 927, Art. V (1855).

The parties do not dispute, and the Court finds, that the project will be located in an area of the Puget Sound which has been previously adjudicated as within the "usual and accustomed" fishing grounds of the Lummi Nation. *United States v. State of Washington*, 384 F.Supp. 312, 360 (W.D.Wash.1974), *aff'd* 520 F.2d 676 (9th Cir. 1975) (hereinafter *"Boldt I "*) (finding that the relevant area includes "the marine areas of the Northern Puget Sound from the Frasier River south of the present environs to Seattle, and particularly Bellingham Bay …"). Rather, in challenging the Corps' decision that the Lummi Nation's treaty rights will be affected, Northwest argues that the record establishes that the project will have no effect, or a de minimis effect, on any

---

**4.** In its Opposition and Reply, Northwest argues that the Corps misinterpreted Indian treaty rights as "property rights" under the regulations on public interest. In its Reply, the Corps opposes this argument and treats it as a challenge to its authority to consider treaty rights. Given the Court's findings on the Corps' fiduciary duty, however, the question of whether treaty rights are "property rights" becomes irrelevant.

treaty right fishing by the Lummi Nation.[5] Thus, the Court must determine whether the proposed site of the project is presently fished by members of the Lummi Nation in a manner contemplated by the treaty and, if so, whether the project will affect rights protected by the treaty.

In determining the extent of treaty rights retained by present day successors to the original signatory tribes, the Court is guided by various well-established principles. The signing of the treaty only acted as a limitation on, not a taking of, rights previously held by the Indians. *United States v. Winans,* 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905). As such, the act of signing the treaty is appropriately viewed as a reservation of rights by the Indians, rather than a grant of rights from the United States. *Id.* In interpreting these rights, the Court must construe treaty language in the manner in which the Indians understood it. *Id.* Accordingly, the determination of whether the Lummi Nation presently exercises its treaty fishing rights in the proposed site must be guided by an interpretation of the Indians' understanding of the rights reserved by the treaty.

As noted above, Article V of the Treaty of Point Elliott reserved to the Indians the right to fish "at all usual and accustomed grounds and stations." The words "usual and accustomed," as contemplated by the treaty, have been defined as "closely synonymous words" which "indicate the exclusion of unfamiliar locations and those used infrequently or at long intervals and extraordinary occasions." *Boldt I,* 384 F.Supp. at 332. As such, these areas include "every fishing location where members of a tribe customarily fish[ ] from time to time ..." *Id.* Therefore, contrary to the assertions of Northwest, the site in question need not be the primary or most productive one for fishing. Instead, the correctness of the Corps' determination that the proposed site should presently be afforded treaty protection depends upon whether the record supports the conclusion that the site is fished by members of the Lummi Nation on more than an extraordinary basis.

The record contains numerous figures and statements concerning Lummi Nation fishing in the proposed site of the project. Figures in the record indicate that sockeye salmon migration moves from the Rosario Channel to the Lummi Rocks within the proposed area. AR 610–11. These figures also show that tribal purse seine fishing takes place in the proposed area. *Id.* Moreover, affidavits in the record state that the area is used by members of the Lummi Nation at regular, but varying rates, depending upon various uncontrollable factors. Affidavit of Alan Chapman, at 9; AR 403. Finally, the record also indicates the names of numerous Lummi Nation members who have fished the area in recent years. AR 374. Accordingly, the Court concludes that the determination that members of the Lummi Nation presently exercise treaty fishing rights at the location of the proposed site is well supported by the record. As a result, the Court also concludes that the Corps has shown that it correctly determined that the site should be afforded treaty protection. Therefore, the only remaining issue is whether the Corps also correctly found that the project would impair rights reserved in the treaty.

The right to take fish under Article V of the Treaty of Point Elliott has both a "geographical" component and a "fair share" component. *United States v. Oregon,* 718 F.2d 299, 304 (9th Cir.1983); *Muckleshoot Indian Tribe v. Hall,* 698 F.Supp. 1504, 1511 (W.D.Wash.1988). These aspects have been interpreted to offer mutually exclusive protections of the right to access an area for fishing and the right to take a proper quota of fish. *Oregon,* 718 F.2d at 303–04. As such, in reviewing treaty fishing rights, the Courts may not conduct a balancing test which views the right to access in relation to the supply of the proper portion of fish. *Id.* at 304 n. 6.

---

5. Northwest also asserts that the Corps should be bound by the determinations made during the state permitting process on the issue of the pro-ject's impact on fishing. This argument will be dealt with below.

■ In arguing that its project will not affect or will have only de minimis effect upon Lummi Nation fishing, Northwest focuses almost exclusively upon the impact upon overall fishing of the Lummi Nation and the correlating impact on the amount of fish available. Northwest asserts that, unlike areas discussed in other cases, the area in question is neither productive, nor one which the Lummi Nation uses primarily. Accordingly, Northwest argues that the SHB correctly determined that the project would have "no substantial impact on fishing" and that this finding illustrates a de minimis effect on tribal fishing rights under the treaty. The Court disagrees.

Northwest's argument collapses the geographical aspect and the fair share aspect of the Lummi Nation's fishing rights under the treaty. Having found that fishing activity contemplated by the treaty occurs at the proposed site, the Court concludes that the Corps' decision need not be based upon a finding that the project will substantially affect the amount of fish available to the Lummi Nation. Rather, the record need only support the Corps' conclusion that the project would affect the Lummi Nation's right to access.[6]

The Court finds that the record supports the Corps' conclusion that the Lummi Nation's right to access would be affected by the project. As noted above, the required area of the project, including anchorage, would cover some 11.36 acres. In numerous places, the record also indicates that this entire area would be obstructed to tribal members attempting to use nets and other gear. Affidavit of Alan Chapman, at 8; AR 403; Deposition of Bobby Davis, AR 727–28; Whatcom County Hearing Examiner, Decision on Reconsideration, at AR 332–34. Thus, the Court finds that the Corps has shown that it appropriately relied upon a determination that the project would interfere with treaty fishing rights of the Lummi Nation in denying the § 10 permit.

## B. RES JUDICATA/COLLATERAL ESTOPPEL

As previously noted, Northwest argues that the Corps' decision-making process must be bound by the findings of the SHB on the project's potential effect on fishing. Initially, Northwest asserts that the doctrines of res judicata and collateral estoppel impose this binding effect.

■ In determining the extent to which state judgments are entitled to preclusive effect in the federal arena, the Court must look to the relevant state law standards of res judicata and collateral estoppel. *Fernhoff v. Tahoe Regional Planning Agency*, 803 F.2d 979, 986 n. 8 (9th Cir.1986).[7] Under the doctrine of res judicata, a party is barred from litigating claims that were, or should have been, litigated in a former action. *Schoeman v. New York Life Ins. Co.*, 106 Wash.2d 855, 859, 726 P.2d 1 (1986). Washington law requires a common identity of four elements for res judicata to apply: (1) of subject matter; (2) of cause of action; (3) of persons and parties; and (4) in the quality of the persons for or against whom the claim is made. *Id.*

■ The doctrine of collateral estoppel differs from res judicata in that it precludes re-litigation of specific issues actually litigated and necessary determined by a court. *Shoemaker v. Bremerton*, 109 Wash.2d 504, 507, 745 P.2d 858 (1987). Four elements are required for the application of collateral estoppel: (1) identical issues; (2) a final judgment on the merits; (3) the party against whom the decision on the issue is asserted must have been a party to, or in privity with a party to, the prior litigation; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied. *Id.*

---

6. Northwest also appears to argue that the coverage area of the project is de minimis in relation to the total area available for fishing by members of the Lummi Nation. Accepting the argument that an area of obstructed access may at times be so small as to be considered de minimis, the Court nonetheless concludes that the proposed area of Northwest's project rises above this standard.

7. Northwest appears to argue the application of federal standards of estoppel. However, the Court would reach the same result under either formulation of the doctrines.

Procedural differences in the two proceedings at issue will not necessarily bar the application of collateral estoppel. *Neff v. Allstate Ins. Co.*, 70 Wash.App. 796, 801, 855 P.2d 1223 (Div. I 1993). Instead, courts look to whether the parties to the earlier proceeding received a full and fair hearing on the issue in question. *Id.* If the prior adjudication was before an administrative body, additional factors may be considered in deciding whether to give a finding preclusive effect. These include: "(1) whether the agency acting within its competence made a factual decision; (2) agency and court procedural differences; and (3) policy considerations." *Shoemaker*, 109 Wash.2d at 508, 745 P.2d 858.

In the present case, the Court concludes that neither the doctrine of res judicata nor collateral estoppel bind the decision of the Corps. Most importantly, the requirement of commonality of claims or issues is not met. As noted above, the SHB expressly disavowed any reliance upon the Lummi Nation's treaty rights in issuing its decision. Shorelines Hearing Board, Final Opinion, at AR 325. Accordingly, while the SHB's opinion may reflect a binding decision on issues of state law, it does not have the same effect upon the Corps' permitting decision and interpretation of the Lummi Nation's treaty rights.[8]

### C. COORDINATED REVIEW

Northwest asserts that the Corps must be bound to the SHB's finding of no significant impact on fishing by its own regulations. In this regard, Northwest points to the Corps' regulations allowing satisfaction of NEPA requirements through a coordinated review process with state and local agencies. Northwest argues that these regulations mandate that the Corps be bound by the conclusions within state and local environmental evaluations. Factually, Northwest claims that the Corps became bound by the SHB's determinations in this case by "appending" the County's environmental impact statement and the SHB's final opinion into the § 10 permit decision document. The Court concludes, however, that Northwest's argument cannot withstand scrutiny.

The Corps' regulations for implementing NEPA specifically authorize it to cooperate with state and local agencies in environmental decision-making. 40 C.F.R. § 1506.2.[9] Such cooperation is, at a minimum, strongly encouraged by the regulations. 40 C.F.R. § 1506.2(b) (stating that "[a]gencies shall cooperate with state and local agencies to the fullest extent possible ..."). If the Corps utilizes this "coordinated review" process, the regulations further authorize the use of a single EIS. 40 C.F.R. § 1506.2(c). The Corps may also incorporate the contents of state and local environmental evaluations by reference into decision documents. 33 C.F.R. § 325 App. B (incorporating 40 C.F.R. § 1506.4).

Assuming for purposes of summary judgment analysis that the relevant EIS contains a finding of no significant impact on fishing, an assertion which the Corps disputes, Northwest's argument must still fail. The Court finds that the record does not support the conclusion that the Corps utilized or adopted the state and local environmental process to meet NEPA obligations. Instead, the record illustrates that the Corps' decision to deny the permit was classified a "no action alternative." Department of the Army Permit Evaluation and Decision Document, at AR 311. Accordingly, the Corps appropriately determined that the decision would not have a "significant effect on the quality of the human environment" and any need to prepare an EIS under NEPA was not triggered. *Id.*[10] Thus, the Court concludes that North-

---

8. Considering its previous findings on whether the project would affect treaty rights, the Court also notes that application of these judicially created doctrines would allow the SHB decision to extinguish part of the Lummi Nation's treaty rights. Such a result would not only be barred by the principle that only Congress can extinguish treaty rights, it would also work an injustice upon the Lummi Nation and run contrary to public policy.

9. The provisions of 40 C.F.R. are incorporated by reference into the Corps' regulatory requirements.

10. Under 42 U.S.C. § 4332(C), environmental impact statements are required for "major Fed-

west's argument that the Corps adopted, and should be bound by, the County EIS to comply with NEPA obligations must be rejected. Indeed, the Court finds that the Corps has sufficiently shown that it reached its own NEPA determination that no EIS was required independent of the state and local process.[11]

## D. § 10 PERMITTING PROCEDURES

 As a final argument, Northwest asserts that it did not receive a fair hearing on the § 10 permit decision due to numerous violations by the Corps of its permitting regulations.

The Corps' regulations provide that a permit application comment period should extend for a "reasonable period of time" and "not be more than 30 days nor less than 15 days from the date of the notice [of a permit application]."[12] 33 C.F.R. § 325.2(d)(2). The regulations further provide that the district engineer will issue an opinion on a permit application "not later than 60 days after receipt of the completed application ..." 33 C.F.R. § 325.2(d)(3). This period may be extended, however, under any of a number of express exceptions. 33 C.F.R. § 325.2(d)(3)(i)–(vi). In issuing permitting decisions, the Corps is guided by the policy

that it "is neither a proponent nor opponent of any permit proposal." 33 C.F.R. § 320.

Northwest alleges that the Corps violated each of the regulations cited above.[13] Specifically, Northwest claims that the Corps: (1) ignored the original comment and decision deadlines; (2) acted as an opponent to the project by soliciting comments from the Lummi Nation; and (3) refused to allow Northwest a chance to respond to the late comments of the Lummi Nation.[14] Accordingly, Northwest asserts that the decision of the Corps should be reversed. The Court rejects this argument.

Northwest's argument on the Corps' deadlines is not supported by the law or the record. Although the regulations provide for a comment period of a certain length, they do not preclude the Corps from accepting or considering untimely submissions. Moreover, the record shows that the Corps requested submissions only after either the Lummi Nation or Northwest raised specific issues concerning treaty rights. The Court finds that this practice does not violate Corps' permitting regulations on deadlines. Similarly, the Court finds that Northwest's allegations that the Corps acted as an opponent and wrongfully refused to allow Northwest a final chance to respond to comments from the Lummi Nation also lack support.[15]

---

eral actions significantly affecting the quality of the human environment ..."

11. The Court notes that its conclusions find further support in the fact that the final EIS under the state and local process was issued approximately four months prior to the time that Northwest applied to the Corps for the § 10 permit.

12. The original Corps' "Public Notice of Application for Permit" is dated September 6, 1990, with an expiration date of October 6, 1990. US Army Corps of Engineers, Public Notice of Application for Permit, at AR 313. The Notice states that any comments should be received by the Corps no later than the date of the expiration. *Id.* at 314. On October 5, 1990, the Lummi Nation filed a comment which incorporated its Response filed in the state and local proceedings. This comment focused on the adverse environmental impacts of the project.

13. Northwest also asserts that the Corps failed to follow regulations providing for acceptance of favorable decisions from state permitting agencies. Essentially, this argument re-asserts Northwest's position that the Corps may not rely solely

upon treaty rights to deny a § 10 permit. The Court has already rejected this argument above.

14. As a basis for these claims, Northwest contends that by mid–1991, the Corps' position was that only one issue remained to be resolved prior to issuing a permit decision: whether the Lummi Nation's fishing claim could block the project. Northwest alleges that, rather than making a prompt determination on this issue as required under the regulations, the Corps improperly solicited comments from the Lummi Nation and urged it to adopt a resolution against the proposed project.

15. The Court also notes that Northwest's arguments again fail to take the Corps' trust responsibility into consideration. This trust relationship has at least two fundamental implications to the present issue. First, it provides a legitimate explanation for the Corps' request for information from the Lummi Nation. Second, it requires that the Corps not abrogate the treaty rights without express Congressional authority. The Court is unaware of any such authority which would allow the Corps, or this Court, to take action impinging on Indian treaty rights for potential mistakes in a permitting process.

## IV. CONCLUSION

In accordance with the foregoing analysis, the Court hereby finds and ORDERS:

1) Northwest Sea Farms, Inc.'s Motion for Summary Judgment is DENIED.

2) The Corps of Engineers and Colonel Donald Wynn's Cross Motion for Summary Judgment is GRANTED.

3) This case is DISMISSED.

SO ORDERED.